George Schwarzkopf v. Commissioner.
Schwarzkopf v. Commissioner
Docket No. 50900.
United States Tax Court
T.C. Memo 1956-155; 1956 Tax Ct. Memo LEXIS 137; 15 T.C.M. (CCH) 762; T.C.M. (RIA) 56155; June 29, 1956
Logan Morris, Esq., Land Title Building, Philadelphia, Pa., and Joseph J. Pugh, Esq., for the petitioner. Max J. Hamburger, Esq., for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: The respondent determined deficiencies in the petitioner's income tax and additions to tax under sections 293(b) and 294(d) of the Internal Revenue Code of 1939 as follows for the indicated years: Additions to tax
Sec.
Sec.
Year
Deficiency
293(b)
294(d)
1946
$ 20,027.69
$10,208.94
$1,322.46
1947
9,356.04
4,678.02
545.66
1948
19,942.57
9,971.28
1,157.59
1949
9,301.21
4,650.60
586.66
1950
17,020.85
8,510.42
984.73
1951
125,811.42
62,905.71
7,710.98
Issues presented for determination are the correctness of the respondent's action (1) *138 in determining that petitioner's income for the years 1946 through 1951 was to be determined on the basis of increases in the petitioner's net worth plus petitioner's personal expenditures for the respective years, (2) in determining the amounts of petitioner's income for the respective years on such basis, (3) in determining that for the years 1946 through 1951 petitioner was liable for additions to tax for fraud under section 293(b) of the Internal Revenue Code of 1939, (4) in determining that the period of limitations for assessment of tax for 1946 and 1947 has not expired, and (5) in determining that for each of the years 1946 through 1951 petitioner was liable for additions to tax under section 294(d) of the Code because of substantial underestimation of tax. Findings of Fact Some of the facts have been stipulated and are found accordingly. During the taxable years involved herein, 1946 through 1951, the petitioner was unmarried and resided at 2901 Pacific Avenue, Atlantic City, New Jersey. The petitioner's Federal income tax returns for the foregoing years were prepared by him personally and were filed with the collector for the first district of New Jersey. The returns *139 were prepared on the calendar year basis from books and records kept by the cash receipts and disbursements method of accounting. The petitioner was born in Alsace-Lorraine in 1894. Later his family moved to Berlin, Germany. He graduated from the Medical School of the University of Konigsberg, East Prussia, Germany, in 1918. During the First World War and prior to his graduation from medical school, he served in the German Army in a medical capacity. Following his graduation from medical school, he served as a lieutenant in the Medical Corps of the German Army. The petitioner never practiced medicine in Germany except during 1925 when he substituted for colleagues at the University Hospital at Konigsberg where he was employed. In the early part of 1926 the German quota for immigrants to the United States was filled but the French quota was not. Since petitioner was born in Alsace-Lorraine he arranged to come under the French quota, and, in February 6, 1926, he emigrated from Germany to the United States under a French quota. He became a citizen of the United States in August 1932. In August 1926, the petitioner was licensed to practice medicine in New Jersey. Since then he has *140 engaged in practice in that state as an oculist and eye surgeon. During the years involved herein, as well as for sometime prior thereto, the petitioner had his office in his residence, which he purchased in 1932 for $25,000. On the first floor of the residence were the petitioner's waiting room, his office, a dark room, a dining room and a kitchen. Aside from a living room and bath which the petitioner used as his living quarters, the second floor consisted of an operating room in which the petitioner performed surgical operations on his patients and two rooms containing two beds each for hospitalizing operative patients. The petitioner's operative patients requiring hospitalization were hospitalized from 3 days to 3 weeks, depending on the nature of their operations. In addition to providing such patients with rooms in his residence during the period of their hospitalization, the petitioner also provided them with food and drugs, nursing (except special nursing), laboratory and laundry services, and other required items. The petitioner endeavored to group operative patients so that no patient was alone while being hospitalized. Subject to some variations, as in case of a patient's *141 inability to pay the usual fee, the petitioner's fee was $15 per office visit. His fees for operations usually were substantial, ranging as high as $5,000. Some of the patients paid petitioner for their office visits at the conclusion of their visits. Others were billed at the end of the month for their visits and paid after receipt of a bill. Some operative patients paid all or a portion of the petitioner's charge for their operation prior to the operation. Others paid after the operation. For the purpose of recording receipts from his profession, the petitioner, personally and in his own handwriting, kept a small book, sometimes hereinafter referred to as the receipts book, in which a separate page was devoted to each month of the year. On the respective pages the petitioner, for each of the years 1946 through 1951, entered consecutively and in columnar form the days of the month, such as 1, 2, 3, 4, etc., and certain amounts as representing the corresponding day's total receipts from patients who paid for their visits that day and from those patients who on that day paid their bills for prior visits. However, the names of the patients from whom such total receipts were received *142 were not entered. For some of the days of some of the months of 1946 the amounts so entered as total receipts included sums as representing "net receipts" from operative patients, that is, total receipts from surgical operations less deduction for hospitalization expenses. Where the amount entered for a given date included net receipts from operations, a surname or surnames usually were entered but ordinarily no separate amount was shown with respect to any particular name. However, in some instances no name or names were shown. At the end of the month the amounts shown for the respective days were totaled and the amount thus obtained was entered on the page as the total for the month. At the end of 1946 the monthly totals were added and the amount thus obtained by petitioner, $19,691, was entered by him in the book and on his income tax return for 1946 as his total receipts for the year from his profession. The correct total of the entries shown in the receipts book for 1946 was $19,780. The same receipts book was used by petitioner for the purpose of recording receipts from his profession for the years 1947 through 1951. The same method was employed during those years as was used *143 in 1946 in recording daily receipts except as to those from surgical operations. For those months for which income from operations was received, a single amount was entered at the end of the month as representing the "net receipts" - total receipts less deduction for hospitalization expenses - from operations during the month and one or more surnames were entered in connection therewith. No separate amount was shown with respect to any name. In some instances the abbreviation "etc" was also entered following the names, indicating that the amount entered also included a collection or collections for an operation on a patient whose name had not been entered in the petitioner's records and which name the petitioner then had forgotten. In some instances single amounts were entered as net receipts for the month from operations but no name was entered with respect thereto. In the case of all entries of single amounts as net receipts from operations, no dates or other matters were shown to indicate when the amounts, or any portion thereof, were received. At the end of the month the single amounts entered as net receipts from operations were added to the total of other receipts computed for *144 the month, previously entered on the page, so as to get total receipts for the month from petitioner's profession. At the end of the year the totals for the respective months were added, and the amount thus obtained was entered by petitioner in his receipts book and on his income tax return as his total receipts for the year from his profession. The total receipts as thus computed and entered by petitioner in his receipts book and on his income tax returns as total receipts from his profession were as follows for the indicated years: 1947
$20,883.00
1948
18,158.53 *
1949
18,344.50
1950
19,207.50
1951
21,377.00
The correct totals of the entries shown in the receipts book were as follows for the years indicated: 1947
$20,099.00
1948
18,265.00 *
1949
19,538.56
1950
19,610.50
1951
21,579.00
The petitioner also maintained a book designated *145 "Account Book" which was kept by his secretaries and in which unpaid charges for services to patients were listed for each month. In this book the names of the patients and the amounts of the charges are shown by months. Each month, bills for the amounts of such charges were sent to patients and as payments were made the charges were marked paid in the account book. Except for occasional instances the dates of payment of bills sent during 1946 through 1949 were not recorded in the account book. A substantial number of the dates of payment of bills sent in 1950 were recorded, and practically all the dates of payment of bills sent in 1951 were recorded. A comparison of the receipts book with the account book for periods when the dates of payment of bills were recorded in the account book discloses various instances where the account book shows the receipt of payment on given dates of bills in stated amounts, but the receipts book for the corresponding dates either shows no receipts whatever or substantially smaller amounts of receipts than shown in the account book for such dates. With respect to his professional expenses, other than those relating to the hospitalization of operative *146 patients, and his income from dividends and interest, the petitioner maintained another book which was kept by his secretaries and which was submitted in evidence in this proceeding as Exhibit 35. The expenses and deductions recorded in that book were adequately supported by cancelled checks. Neither the petitioner's receipts book nor any other of his records show the full names of all his patients who paid for their visits at the time of their visits and the amounts so paid. Neither does his receipts book nor any other of his records show the full names of all patients upon whom he performed surgical operations, the amount of the fee paid by each, the names of any charity patients, or any other data from which his gross income from operations performed can be determined. Nor do petitioner's records show what amount or amounts of expenses he incurred in the hospitalization of any operative patient or group of such patients. On August 17, 1927, or about a year after he was licensed to practice medicine in New Jersey, the petitioner rented from Guarantee Bank and Trust Company, Atlantic City, New Jersey, a safe deposit box with the dimensions of 5inch X 5inch X 21 1/2inch. He continued *147 to rent this box until February 23, 1945, when he rented a box with the dimensions of 11inch X 2 1/2inch X 21 1/2inch. He continued to rent the latter box until January 20, 1947. On that date he rented a box with the dimensions of 11inch X 4inch X 21 1/2inch which he since has continued to rent. At least since about 1945 the petitioner has had a large safe in his residence. Beginning about 1927 and continuing afterwards the petitioner kept currency in his safe deposit box, and he almost always had some money in the safe in his residence except when he was traveling and the residence was left unprotected. During the taxable years 1946 through 1951, as well as for many years prior thereto, the petitioner maintained a checking account with the Guarantee Bank and Trust Company of Atlantic City. The deposit slips in use at the bank provided separate spaces for the listing of deposits of currency, specie, and checks. However, the petitioner, in making deposits, regularly followed a procedure, which was unusual at the bank, by which deposits consisting solely of checks were shown on the deposit slips as consisting solely of currency. By reason of this procedure the bank was unable, in some *148 instances where checks were actually cashed, to determine whether the proceeds of such checks were or were not deposited by petitioner. In connection with the procedure patients' checks were cashed, some in substantial amounts, and the proceeds were paid to the petitioner, who usually received currency in large denominations. Not having had much confidence in banks prior to the time they were closed in 1933 and having less confidence in them after they were closed because of his losses in closed banks and with the intention of not being "stuck again" in banks, the petitioner, on occasions during the years 1933 to about 1946 or later, would place cash received from patients and proceeds received from patients' checks in his safe deposit box. Thereafter the petitioner on occasions would remove money from his safe deposit box and deposit it and income from his profession in his bank account. During 1946 through 1951, the petitioner continued to have the above-mentioned account at the Guarantee Bank and Trust Company. During 1950 and 1951 he maintained in the same bank joint accounts with his father, Joseph Schwarzkopf, who emigrated to the United States in 1947. During 1947 through *149 1951 the petitioner had an account at the Boardwalk National Bank, Atlantic City, New Jersey. In 1951 he had an account at the Ventnor City National Bank, Ventnor City, New Jersey. During the same year he also had an account at the National Bank of Ocean City, Ocean City, New Jersey. The following is a statement of the total amounts deposited by petitioner in the indicated banks during the indicated years, the number of days during such years on which he made deposits and the number of such days on which he also entered his safe deposit box: GUARANTEE BANK AND TRUST CO.: (Petitioner's individual account)
Number of
days on
which de-
posits were
Number
made that
of days
petitioner
on which
also entered
Total
deposits
his safe
Year
deposits
were made
deposit box
1946
$32,638.14
10
9
1947
36,955.43
25
21
1948
58,386.95
24
20
1949
44,341.75
28
24
1950
58,366.55
52
49
1951
85,890.96
65
52
Joseph & George Schwarzkopf: (Joint account)
1951
3,000.00
1
1
GUARANTEE BANK AND TRUST CO.: Joseph & George Schwarzkopf, Special: (Joint account)
1950
$ 3,500.00
1
1
1951
300.00
1
1
BOARDWALK NATIONAL BANK: 1947
9,660.00
6
5
1948
2,879.00
3
2
1949
20,232.79
8
7
1950
9,860.60
7
3
1951
57,997.52
42
28
VENTNOR CITY NATIONAL BANK: 1951
26,773.00
18
7
NATIONAL BANK OF OCEAN CITY: 1951
50,995.00
2
1
*150 Being unable to reconcile the petitioner's bank deposits for the years 1946 through 1951 with the petitioner's income as reflected in his receipts book for the respective years, the respondent determined the petitioner's income for such years on the basis of the petitioner's increases in net worth for the respective years plus petitioner's personal living expenses for such years. In determining the increases in the petitioner's net worth, the respondent determined that the petitioner did not have any undeposited cash on hand at the beginning of 1946, that he had undeposited cash of $32,000 at December 31, 1951, that the latter amount had been accumulated ratably over the years 1946 through 1951, and that, accordingly, petitioner's undeposited cash on hand at the end of the indicated years was as follows: 1946
$ 5,333.33
1947
10,666.66
1948
16,000.00
1949
21,333.33
1950
26,666.66
1951
32,000.00
The petitioner's net income as reported in his income tax returns for the years 1946 through 1951, his net income as determined by the respondent for the respective years and the amount of unreported taxable income as determined by the respondent for such years *151 are as follows: Unreported
Net in-
taxable
Net
come as
income
income
determined by
determined
Year
reported
respondent
by respondent
1946
$14,688.25
$ 49,140.24
$ 34,451.99
1947
14,244.31
31,908.91
17,664.60
1948
14,200.40
50,744.70
37,544.30 *
1949
16,040.59
34,376.53
19,335.94 *
1950
17,000.79
48,125.46
31,124.67
1951
21,721.06
175,466.96
153,745.90
Aside from undeposited cash on hand, the petitioner's assets and reserves for depreciation andl increases in assets were as follows on the indicated dates and for the years indicated: ASSETS
12/31/45
12/31/46
12/31/47
12/31/48
Cash balances in Checking and
$ 11,990.13
$ 18,528.26
$ 19,597.32
$ 11,206.26
Savings Accounts of
petitioner
Due from Newburger & Company
(Securities Brokers)
Mortgages
2,500 .00
26,500.00
20,500.00
50,500.00
Loans, Notes and Advances
19,000.00
15,500.00
Securities
24,686.02
31,428.92
34,205.10
51,212.88
Automobiles - Oldsmobile
1,600.00
1,600.00
1,600.00
1,600.00
- Oldsmobile
Real Estate -
2901 Pacific Ave., Atlantic
City, N.J. -
- Building
20,000.00
20,000.00
20,000.00
20,000.00
- Land
5,000.00
5,000.00
5,000.00
5,000.00
108 N. La Clede Ave.,
4,500.00
4,500.00
4,500.00
4,500.00
Atlantic City, N.J.
Lot No. 22, Block 617,
822.66
822.66
822.66
822.66
Margate City, N.J.
House Equipment
396.25
684.91
1,119.47
Furniture, Fixtures and
839.58
1,128.23
2,437.78
Equipment
TOTAL
$ 71,098.81
$109,615.67
$127,038.22
$163,899.05
DEDUCT
Reserves for depreciation -
108 N. La Clede Ave.,
1,665.00
1,800.00
1,985.00
2,070.00
Atlantic City, N.J.
Depreciable business
4,350.00
4,791.98
5,295.19
5,895.33
equipment
TOTAL
$ 6,015.00
6,591.98
7,230.19
8,758.17
7,965.33
BALANCE
$ 65,083.81
$103,023.69
$119,808.03
$155,933.72
Increase in assets for year
$ 37,939.88
$ 16,784.34
$ 36,125.69
ended
*152 ASSETS
12/31/49
12/31/50
12/31/51
Cash balances in Checking and
$ 43,838.71
$ 29,574.77
$105,276.43
Savings Accounts of
petitioner
Due from Newburger & Company
5,591.33
(Securities Brokers)
Mortgages
52,500.00
54,000.00
52,500.00
Loans, Notes and Advances
14,950.00
5,500.00
11,000.00
Securities
38,759.77
81,513.44
122,979.22
Automobiles - Oldsmobile
1,600.00
1,600.00
1,600.00
- Oldsmobile
2,491.20
2,491.20
Real Estate -
2901 Pacific Ave., Atlantic
City, N.J. -
- Building
20,000.00
20,000.00
20,000.00
- Land
5,000.00
5,000.00
5,000.00
108 N. La Clede Ave.,
4,500.00
4,500.00
4,500.00
Atlantic City, N.J.
Lot No. 22, Block 617,
822.66
Margate City, N.J.
House Equipment
1,330.23
1,434.73
1,434.73
Furniture, Fixtures and
2,648.54
2,753.04
2,753.04
Equipment
TOTAL
$185,949.91
$208,367.18
$335,125.95
DEDUCT
Reserves for depreciation -
108 N. La Clede Ave.,
2,205.00
2,283.75
2,283.75
Atlantic City, N.J.
Depreciable business
6,553.17
7,247.83
8,072.27
equipment
TOTAL
9,531.58
10,356.02
BALANCE
$177,191.74
$198,835.60
$324,769.93
Increase in assets for year
$ 21,258.02
$ 21,643.86
$125,934.33
ended
*153 The petitioner did not have any liabilities on the above indicated dates. The petitioner's personal living expenses were as follows for the indicated years: 1946
$ 6,370.54
1947
10,371.64
1948
10,285.67
1949
8,786.39
1950
20,805.52 *
1951
45,918.18 **
On the following dates the petitioner had undeposited cash on hand in the indicated amounts: January 1, 1946
$101,000
December 31, 1946
62,000
December 31, 1947
52,000
December 31, 1948
32,000
December 31, 1949
32,000
December 31, 1950
32,000
December 31, 1951
32,000
The petitioner's income tax returns for 1947 through 1951 *154 were false and fraudulent and were made with the intent to evade tax. A part of the deficiency for each of the years 1947 through 1951 is due to fraud with intent to evade tax. Opinion The petitioner takes the position that the books maintained by him were adequate for the recording and reporting of income and that they substantially reflect his correct income for the years involved herein. He contends that, subject to the correction of certain suggested mathematical errors in computation, his income tax returns for the years in question should be accepted as filed. He further contends that, in the situation presented, the respondent's use of the net worth method, instead of his (petitioner's) books, in determining taxable income was not justified. The record shows that the amounts reported by petitioner for the years in question as the total receipts from his profession were taken from his receipts book. Respecting the receipts book and the recording of receipts, the petitioner testified that, except as to receipts from surgical operations, the amounts paid to him or to his secretary each day, including checks received, were placed in the right-hand drawer of his desk; that *155 at the end of the office hours for the day, the cash and checks so received during the day were removed by him from the drawer of his desk and taken by him from his office to his living quarters in the upstairs of his house where he entered the total amount of such receipts in his receipts book as his total receipts for that day. From the foregoing testimony it would appear that, except as to receipts from operations, the amount entered by petitioner in the receipts book for any given day represented the actual receipts for that day, and that if no amount was entered for the day, it was because no amount had been received on that day. As shown by our findings, the petitioner's account book for the greater portion of the period 1946 through 1951 fails to show the dates of payment by patients of their bills. However, an examination of that book for the portion of the period when dates of payments of bills are shown discloses various instances of where on a given date the payment of one or more bills by patients was recorded in the account book but no receipts whatever were recorded in the receipts book for the corresponding date, or if any receipts were recorded, they were recorded in *156 a substantially lesser amount than shown by the account book for that day. This situation not only fails to support the accuracy of the petitioner's testimony and that of his receipts book, but tends to discredit the accuracy of both. As to receipts from surgical operations, the petitioner concededly had total receipts in excess of the amounts entered in his receipts book. He testified that the amounts entered in the receipts book represented "net receipts," that is, the total received for one or more operations less the expenses of hospitalization of an operative patient or patients. Some of the petitioner's testimony is to the effect that he sought to group operative patients so that if he had one or more paying operative patients he could take an operative patient who was unable to pay. The implication of this testimony is that the total received from an operative patient or patients was reduced not only by the expenses of hospitalization of such patient or patients, but also by the hospitalization expenses of the operative charity patients. If during the years in question the petitioner had any operative charity patients or hospitalized any charity patients, the record fails *157 to disclose it. Some of petitioner's testimony indicates that he did not keep records with respect to charity patients. The petitioner testified that the amounts deducted as hospitalization expenses from the total receipts from operative patients to arrive at the amounts entered by him in his receipts book as the net amount received from operations were computed from slips and bills covering the respective items constituting the expenses of hospitalization; that such slips and bills were clamped together, placed in an envelope and retained for "a year or so" after his income tax return for the respective year was prepared and then disposed of; and that he does not now have those records. The record herein shows that the investigation of petitioner's tax liability for the years involved herein began on October 11, 1951, and that the last visit of the investigating agents with the petitioner respecting the examination was late in 1952. If the petitioner's testimony respecting the data from which he computed deductions for hospitalization expenses and the period for which he retained such data is correct, then it would appear that at the time the investigation began he had disposed *158 of the data for years prior to 1950 but had such data for the full year of 1950, and for the preceding portion of the year 1951, and that at the time of the last visit of the investigating agents late in 1952, he had such data for the full year 1951. The petitioner makes no claim that, and there is no evidence that, such data was submitted to the agents. Nor does petitioner make any explanation as to why, if he had such data, he did not submit it to the agents, or why, if he had it, he disposed of it during the agents' examination or before there was any final settlement of his tax liability, at least with respect to the years 1950 and 1951. In view of the foregoing and since the petitioner maintained no records from which the total amounts received in any year from operative patients can be determined, we are without any basis upon which to find that the petitioner's receipts book substantially reflects his net receipts from operative patients. In view of what has been said above, we are unable to find that the petitioner's books substantially reflect his correct income from his profession for the years in controversy. As was held in Harry Gleis, 24 T.C. 941, the mere *159 fact that a taxpayer keeps books from which an income can be computed does not bar the respondent from using the net worth method. There we said: "As we have heretofore held, the net worth method is not a method of accounting within the scope and meaning of section 41, supra. It is not a substitution for any recognized system of keeping books of account. Morris Lipsitz, 21 T.C. 917. Rather, if properly applied, the net worth method merely evidences income apparently received. Estate of W. D. Bartlett, 22 T.C. 1228. Nor is its use banned simply because a taxpayer maintains a set of books from which an income can be computed. To the contrary, when there is an inconsistency between the taxpayer's increase in net worth and the income as reflected in his books and reported by him on his tax returns, the net worth method, if approved, provides clear and convincing evidence that such books are not trustworthy, and that all income has not been reported. Morris Lipsitz, supra." Accordingly, we hold that the respondent's use of the net worth method was not unjustified and sustain the respondent on this point. The petitioner next takes the position *160 that if the respondent's use of the net worth method was justified, his determination of income based thereon cannot be sustained. In support of his position the petitioner contends that the respondent's determinations of net worth were erroneous because of his failure to include any amount as undeposited cash on hand in assets at December 31, 1945, and because of inadequate inclusions in assets for undeposited cash on hand at the end of later years. Although petitioner contends that he had undeposited cash on hand of approximately $300,000 on December 31, 1945, he makes no contention as to any specific amount being on hand at the end of any later year. The petitioner testified that from 1933 to about 1946 or later, he maintained a low balance in his checking account; that when the balance became higher than he liked, he placed receipts from his profession in his safe deposit box; and that thereafter he removed money from his safe deposit box and deposited it and receipts from his profession in his bank account. The petitioner further testified that on December 31, 1945, he had approximately $300,000 of undeposited cash on hand. In connection with a will which he executed in March *161 1947, he gave his attorney a statement of his assets and the approximate amounts thereof as of February 15, 1947. In this statement he showed total assets at $355,000 and undeposited cash on hand at $250,000. Thereafter, on April 3, 1947, and during the course of an investigation of his income tax liability for 1945, the petitioner informed the investigating agent that his net worth at December 31, 1946, was in excess of $200,000 of which about $50,000 was in undeposited cash; that there was little difference between his net worth at December 31, 1946, and December 31, 1945, and that there had been very little change in his net worth for the preceding 10 years due to losses. Subsequently, on August 20, 1947, and in connection with the same investigation, the petitioner gave the agent a sworn statement in which he stated that "Today I am worth about $200,000 valued at today's market price." The petitioner's brother, Arthur Schwarzkopf, who emigrated from Germany to the United States in July 1950, testified that at the end of July 1950, he counted the money in the petitioner's safe deposit box and that he thought there was $200,000 in the box at that time. Certain of petitioner's testimony *162 is to the effect that when his brother, Arthur, emigrated to the United States in July 1950, he (petitioner) held in his safe deposit box $60,000 which belonged to Arthur. Arthur testified that he, out of his own funds, gave petitioner 55,000 or 60,000 German marks in 1937 and 200,000 German marks in 1939 to bring to the United States for him. At or about the time of those occasions, Arthur came on visits to the United States with the petitioner on the latter's return from trips to Germany. The record fails to show the exchange rate at such times, or the amounts in dollars realized from a conversion of such marks. The record shows that at a number of times over the years the petitioner took different persons, including Arthur in 1937 and 1939, and Ella Packer in 1942 or 1943, into a booth at the bank and showed them his safe deposit box and the money therein, without a then counting of the money. The petitioner testified that Arthur's money was in the safe deposit box in 1937 and 1939 when he showed him the money in the box, but as to the money showed Ella Packer in 1942 or 1943, the petitioner testified that "That was not the $60,000 from my brother." From the foregoing it appears *163 that any money of Arthur's which petitioner might have had in his safe deposit box in 1937 or 1939 had been removed prior to the petitioner's exhibition to Ella Packer. Since the record is silent as to the disposition made of it after removal, it is difficult to conclude that in July 1950 the petitioner still had $60,000 of Arthur's money in his safe deposit box. Furthermore, the petitioner admitted to knowing that, after the United States entered World War II, persons in the United States holding money belonging to an enemy alien, as was Arthur, were required to make a report thereof to the United States Government, but that at no time did he make a report that he was holding money belonging to Arthur. Whatever may have been the situation with respect to any of Arthur's money which petitioner may have held in July 1950, or at any other time, the fact remains that it was not petitioner's money and, therefore, would not constitute any part of petitioner's undeposited cash on hand. From a consideration of all the evidence bearing on the question, we have concluded that the petitioner's undeposited cash on hand at the end of the years 1945 through 1951 was as set out in our findings. *164 Except for the amount of cash on hand at the end of the years 1945 through 1951, the parties have stipulated as to the petitioner's assets, the amounts thereof, and the depreciation reserves at the end of such years. The full amount of petitioner's personal living expenses for the years 1946 through 1949 and the amount of a portion of such expenses for 1950 and 1951 have been stipulated. The remainder of such expenses has been determined from the evidence. The parties also have stipulated the adjustments, involving comparatively small amounts, to be made for capital transactions for the years 1949 through 1951. The facts as thus stipulated and otherwise determined from the record do not disclose any net income for 1946 in excess of the amount reported by the petitioner for that year. For the years 1947 through 1951, they show net incomes substantially in excess of the amounts reported by petitioner for the respective years. Such showing is clear and convincing evidence that all of the petitioner's income for those years has not been reported. Harry Gleis, supra. The next question for consideration is the correctness of the respondent's determinations as to fraud. *165 Since the record fails to disclose there was any understatement of petitioner's net income in his return for 1946, we hold for him as to fraud for that year. During his testimony, the petitioner variously characterized himself as "a very bad bookkeeper," "a bad mathematician," and as being "bad in adding" and stated that his records were kept as good as he could keep them. However, his testimony and his demeanor as a witness show him to be a highly intelligent man fully capable of keeping, and of causing to be kept, accurate and complete records of his receipts from his profession and from other sources and of his expenditures relating to all of his sources of income. The record also discloses that he had considerable knowledge of the essentials requisite for the proper accounting for and reporting of the kinds of income he received. The petitioner assigned to his secretaries the duty of keeping a record of his receipts from dividends and interest and of his expenditures, other than those relating to the hospitalization of operative patients. To the extent the record shows how well the secretaries performed their assignment, it shows that they performed it accurately and properly. *166 The petitioner himself kept the record of his receipts from his profession. Also he made all determinations of the amounts of expenses for the hospitalization of operative patients which were deducted by him in computing the amounts of net receipts from operations entered by him in his receipts book. All such determinations of hospitalization expenses and the data from which they were prepared were disposed of by petitioner. Those for 1950 and 1951, according to petitioner's testimony, were disposed of by him despite the fact that his tax liability for those years was under investigation and remained unsettled. We think it significant that beginning in 1947 the petitioner changed the method of recording receipts from surgical operations. During 1946 where the entry in the receipts book for a given day included receipts for an operation or operations, the name or names of one or more operative patients also were entered. For instance, the petitioner's receipts book shows an entry date of April 17, 1946, of $5,020 as the total receipts for that day. Immediately to the right of the foregoing amount is the following "($5,000 McSweeney)" indicating that $5,000 of the amount entered for *167 that day had been received from a patient named McSweeney. During the years 1947 through 1951 the recording on specific dates of amounts received from operations was discontinued and, at the end of months during which operations had been performed, the petitioner entered a single amount as the net receipts from operations during the month, along with the one or more names (some of which were written so illegibly that petitioner himself was unable to read them at the hearing) and in some instances with an abbreviation denoting a patient whose name had not been entered on petitioner's records and which name petitioner himself had forgotten by the end of the month. The petitioner gave no testimony directed to his fees for office visits or for operations. However, a witness offered by him and who had known him over a long period and who had visited his office testified that his usual fee for office visits was $15. Other evidence shows that his fees for operations ordinarily were substantial and ranged as high as $5,000. The petitioner prepared his own income tax returns for all the years involved herein. The evidence shows that the net income reported in his returns for each of the *168 years 1947 through 1951 was substantially understated. From the record before us, we are of the opinion that, in preparing and filing such returns, the petitioner was cognizant that they were not true, correct and complete returns of his income for those years. Accordingly, we have found that the returns for the years 1947 through 1951 were false and fraudulent and that a part of the deficiency for each of the years is due to fraud with intent to evade tax. Having concluded above that there was no understatement of the petitioner's net income in his return for 1946, the question of the expiration of the period of limitations for assessment of tax for that year becomes moot. Since the respondent has been sustained on the fraud issue for 1947, we hold that the period within which assessment of tax for that year can be made has not expired. The remaining issue is as to the correctness of the respondent's determinations of additions to tax under section 294(d) of the Code on account of substantial underestimation of tax. The petitioner has not sub mitted any evidence directed to this issue. Accordingly, for lack of proof to show error, the respondent's determinations are sustained *169 to the extent the recomputation of petitioner's tax liabilities pursuant to our findings and holdings herein results in underestimation of tax in the amounts required by section 294(d) for the imposition of the addition provided for therein. Decision will be entered under Rule 50. Footnotes
*. The total computed by the petitioner for the year was $16,615.53 to which he added an amount of $1,543 with the explanation "collected but date unknown" thereby arriving at a total of $18,158.53.↩
*. Including the amount of $1,543 which petitioner explained as "collected but date unknown."↩
*. Standard deduction of $1,000 was allowed in this year.↩
*. Composed of $14,248.48 stipulated personal expenses, $6,000 stipulated amount of a check issued as a gift by petitioner to his brother, Arthur Schwarzkopf, who with his family emigrated from Germany to the United States in July 1950, and $557.04 otherwise given by petitioner to his brother in 1950. ↩
**. Composed of $12,651.23 stipulated personal expenses, $9,000 stipulated amount of a check issued by petitioner to his brother, Arthur Schwarzkopf, as gifts to the latter's three children, and $24,266.95 given by petitioner to his brother in 1951.↩