Sam Silver v. Commissioner. Sam Silver and Mary Silver v. Commissioner.
Silver v. Commissioner
Docket Nos. 50943, 50944.
United States Tax Court
T.C. Memo 1957-181; 1957 Tax Ct. Memo LEXIS 69; 16 T.C.M. (CCH) 810; T.C.M. (RIA) 57181; September 25, 1957
*69 The principal petitioner was a professional gambler who, since about 1928 to 1930, had derived income from gambling in card and dice games, and from betting on and handling wagers on horse races and sporting events such as basketball and baseball games. He at no time prior to 1952 filed any income tax return or declaration of estimated tax, in order to conceal the amounts of his income and his derelictions in failing to file returns for prior years. He kept no record of the amounts of his winnings, income, or assets. In 1948 he made an investment of $92,750 in stock and notes of Arizona Harness Racing Association, Inc.; and in 1949, 1950 and 1951 he made further substantial investments in such Association. The respondent reconstructed his income by the net worth method, and determined deficiencies in income tax and additions to tax for 1944 through 1946 and 1948 through 1951. Held, that the amount of petitioner's adjusted gross income for each of the years 1944 and 1946, as reflected in the net worth statement and notice of deficiency, is increased on the basis of petitioner's admissions and testimony; that the amount of the adjusted gross income for 1948, as determined by respondent, *70 is redetermined by application of the rule of Cohan v. Commissioner, 39 Fed. (2d) 540; and that the amounts of the adjusted gross incomes for the years 1945 and 1949 through 1951, as determined by respondent, are approved because of the failure of petitioner to prove error therein. Held, further, that additions to tax for all years involved should be imposed under sections 291(a), 293(b), 294(d)(1)(A) and 294(d)(2) of the 1939 Code. Sydney R. Rubin, Esq., for the petitioners. John J. O'Toole, Esq., for the respondent. PIERCE Memorandum *71 Findins of Fact and Opinion PIERCE, Judge: These cases which were consolidated for trial, involve deficiencies in income taxes and additions to tax, determined by the respondent as follows: Additions to Tax
Section
Section
Section 294
Section
Year
Deficiency
293(b)
291(a)
(d)(1)(A)
294(d)(2)
Sam Silver, Docket No. 50943
1944
$ 348.00
$ 174.00
$ 87.00
$ 34.80
$ 20.88
1945
4,334.80
2,167.40
1,083.70
433.48
260.09
1946
539.00
269.50
134.75
53.90
32.34
Sam Silver and Mary Silver, Docket No. 50944
1948
63,274.76
31,637.38
15,818.69
6,327.48
3,796.49
1949
4,138.46
2,069.23
1,034.62
413.84
248.31
1950
1,348.88
674.44
337.22
134.88
80.93
1951
6,275.82 *
3,137.91
1,568.96
619.48
371.69
All of said deficiencies were determined with respect to income computed by the net worth method. Following the trial, the respondent amended his answers to conform to the proof; and he therein claimed, in the alternative, any increased deficiencies and additions to tax which will result, if it is found pursuant to certain contentions and proof presented *72 by the petitioners that the amounts of income which they received are greater than those determined in the notices of deficiency. Petitioners admit that no income tax return and no declaration of estimated tax was filed for any of the years involved; and they concede that additions to tax under sections 291(a) and 294(d)(1)(A) of the 1939 Code may properly be imposed in respect of each year for which there was sufficient income to require the filing of such a return or such a declaration. The issues remaining for decision are: (1) What is the amount of the adjusted gross income of the respective petitioners for each of the years involved? The parties have stipulated that for each of the years 1944 through 1946 the tax liability (other than for additions to the tax) shall be computed as in the case of a single person, making use of the standard deduction; and that for each of the years 1948 through 1951 such liability shall be computed as in the case of married persons filing joint returns, with use of the standard deduction. (2) Is any part of any deficiency for each of the years involved due to fraud with intent to evade tax, within the meaning of section 293(b) of the 1939 *73 Code? (3) Should an addition to tax under section 294(d)(2) of said Code, for substantial underestimate of estimated tax, be imposed for each of the years involved? Findings of Fact Certain facts have been stipulated. The stipulation is incorporated herein by reference. Petitioners, Sam Silver and Mary Silver, are husband and wife, and are residents of Syracuse, New York. Sam Silver (hereinafter called the "petitioner") was born in Poland in 1908. He immigrated to the United States in about 1921; settled with his parents in Rochester, New York; and became a naturalized citizen of the United States in 1944. He attended school through the ninth grade, and thereafter for a short time worked in various factories. He married the petitioner Mary Silver on December 25, 1947. Petitioner's occupation since he was about 21 years of age has been that of a professional gambler. Starting in about 1928 or 1930 and continuing until about 1938, most of his gambling was in card games, including poker, pinochle and black jack, which took place in homes, cigar stores and lunch rooms in Rochester and surrounding towns. From about 1938 through 1946, he also gambled extensively in crap games (dice), *74 in Auburn, Batavia and Syracuse, New York. He frequently acted as the "banker" in the various games; and in this capacity, his chances of being an overall winner were increased. On one occasion he won $2,000 in a single evening. He was successful in his gambling, and was a rather consistent winner. Starting in about 1944, petitioner enlarged his gambling activities to include betting on and booking horse races, making and receiving "lay offs" of bets on such races, and also betting on basketball games and baseball games. In 1946 and 1947 he operated a horse-booking establishment in Rochester; but he refused to disclose the people from whom his "lay off" business was received. And in 1949, 1950 and 1951, he operated another establishment for betting on and booking horse races and sporting events, in a room which he rented in a Syracuse office building. This latter operation was carried on under the assumed name of Ritz Recording Company, although no recording business was handled. He paid the rent for the premises, including that under a new leasing arrangement made as of December 31, 1950; paid the charges for about six telephones and a switchboard maintained there; and personally *75 received a refund of $1,336.10 from the telephone company on March 20, 1951. Both before and after his marriage, petitioner made yearly trips to Florida during the horse racing season; and while there he attended the race tracks and won and lost bets on the races. From February 13 through March 24, 1950, he paid rent at a Miami Beach hotel in the amount of $1,045.59; and from March 20 through April 22, 1951, he paid rent at the same hotel in the amount of $687.42. Petitioner did not keep any record of the amounts of his gains, losses or income for any year. He dealt almost exclusively in cash which, during the earlier years, he either carried on his person or kept in a dresser drawer. In later years he had two bank accounts; but most of his winnings were not deposited therein, and the highest amount on deposit at any one time during the years here involved was $270.52. From July 16, 1942 to July 15, 1946, he rented a safe deposit box at a Rochester bank, to which he made frequent visits. From May 16, 1947 to January 16, 1950, he rented another safe deposit box at a different Rochester bank. And, at all times after July 27, 1944, he also had a safe deposit box in a bank at Syracuse. *76 In addition, from July 27, 1944 to July 24, 1945, he rented a night depository bag at the Syracuse bank, in order to enable him to place money in the night depository vault after banking hours. He kept no record of whatever money was in his safe deposit boxes. As before stated, no income tax return and no declaration of estimated tax was filed for any of the years involved. Moreover, petitioner Sam Silver never filed any income tax return for any year prior to 1952. In about 1940 to 1942, he felt that he should file a return, and partially prepared one. But, after discussing the matter with an accountant who represented other gamblers and also after discussing it with certain friends, he deliberately decided not to file a return, so as not to disclose to the Internal Revenue Bureau the amounts of his income and his failure to file returns for prior years. In all subsequent years involved, he continued this practice of willfully not filing returns. In 1940 petitioner falsified a sworn statement which he filed with the Selective Service Board, by misrepresenting that his occupation for the past 3 years had been that of a salesman, and that his average weekly earnings in such job *77 were $25 per week. He did this in order to avoid the possibility that any disclosure of his true income might come to the attention of the Internal Revenue Bureau. Petitioner at no time received any bequests, inheritances, or gifts, except for wedding gifts of about $2,000 in cash received in 1948. He received no loans from his parents or relatives. And he had no policies of insurance. In 1945 petitioner loaned $12,000 to Charles Simone, with whom he had been associated in the operation of a gambling establishment in Syracuse. As collateral security therefor, he received a deed to certain real estate; and he placed this in his sister's name. The loan was repaid in 1947. On or about November 18, 1947, he loaned $3,000 to Joseph Farbo, an attorney in Rochester, for investment in real property; and thereafter, on or about January 20, 1948, he loaned Farbo an additional $25,000 for the same purpose. Farbo regarded said amounts to be "the contribution of Mr. Sam Silver * * * towards the purchase of the Palisades Apartments," in Rochester. On about June 1, 1948, these apartments were resold; and at that time, Farbo treated the property as his own; took all of the sale profits and *78 the rentals; and turned over $28,000 to petitioner. On about November 18, 1948, petitioner again turned over to said Joseph Farbo the sum of $28,000 in cash, which was used as part of the purchase price of the Highlanders Apartments in Rochester. These apartments were resold on December 7, 1949; and thereupon Farbo again treated the transaction as his own; took over any profit or loss and rentals, and paid $21,000 to petitioner. Farbo also credited himself with $7,000 paid to petitioner at some earlier unidentified date. In June 1948, petitioner invested $55,000, under the name of Joseph Farbo, in capital stock and notes of Arizona Harness Racing Association, Inc.; and, at other unidentified dates in 1948, 1949, 1950 and 1951, he made additional investments in such stock and notes. The aggregates of such investment by years were as follows: 1948
$92,750
1949
9,000
1950
29,837
1951
26,705
of which $9,000 was bor-
rowed on a bank note en-
dorsed by other stock-
holders of the corporation. The certificates for these securities were not issued immediately, but were issued at unidentified later dates as the money was paid in. All certificates *79 were issued in the name of the said Joseph Farbo. This was done in order to conceal the fact that petitioner was a stockholder, which he believed might cause refusal of a license to operate the track. Petitioner refused, at the trial, to name his associates in the business; and there is no evidence regarding the corporation's capital, its outstanding shares, its profits or losses, or as to whether any distributions were made to shareholders. On June 20, 1951, petitioner redeemed and received the proceeds of United States Government bonds in the amount of $726, which had been owned by him throughout all of the preceding taxable years here involved. Respondent's agents began an investigation of petitioner's income in the fall of 1951; and this continued until the issuance of the deficiency notices on July 28, 1953. During such investigation, petitioner was contacted and questioned regarding his assets and income; but he volunteered very little information. The agents found that he had no books or records; so they proceeded to reconstruct his income by use of the net worth method and, in this connection, they circularized banks, merchants and others with whom he had dealt. At one *80 of the earlier conferences with petitioner, at which he was accompanied by an accountant, he represented that his only assets and liabilities as of December 31, 1945, 1950 and 1951, were as follows: Assets
12/31/45
12/31/50
12/31/51
Cash
$2,000
$1,000
None
Automobile
1,300
3,300
$3,300
Other assets
None
2,750
2,750
Total assets
$3,300
$7,050
$6,050
Liabilities
Loans payable
None
$3,500
$4,500
Other liabilities
None
None
None
Total liabilities
None
$3,500
$4,500
Net worth
$3,300
$3,550
$1,550 Petitioner told the agents, at the time of declaring said assets, that he did some gambling but on a small-time basis. He did not disclose his loans to Charles Simone and to Joseph Farbo, or his investments made under Farbo's name in Arizona Harness Racing Association, Inc. He refused to sign a statement of the assets and liabilities so disclosed; but on three different occasions, he stated that the above figures were correct. Subsequently, after a special agent of respondent had been assigned to the case in December 1952, petitioner called at the agent's office with an attorney; and he then conceded that the above representations of assets *81 and liabilities were false, and he disclosed additional assets, including his investments in the Arizona Racing Association, Inc. On December 9, 1954, in a proceeding in the United States District Court for the Northern District of New York, petitioner was indicted on two counts under section 1001 of Title 18 of the United States Code, on charges of making false statements to internal revenue authorities. On October 10, 1955, he entered a plea of guilty to both counts of the indictment, and was convicted. The respondent, in his notices of deficiency, determined that the adjusted gross incomes of the respective petitioners for the years involved, computed by the net worth method, were as follows: 1944
$ 2,238.21
1945
14,249.55
1946
3,600.00
1948
126,441.80
1949
20,636.05
1950
9,401.32
1951
24,258.50 All assets included in the net worth statement in respect of which the deficiencies were determined have been stipulated to have been held by the respective petitioners, and there is no dispute regarding the personal expenditures and other liabilities which were included in said statement. In said notices of deficiency, respondent allowed no deductions, *82 other than the optional standard deductions or the deductions automatically allowed in the application of the tax tables. Respondent determined that, as of December 31, 1947, the assets and liabilities of the petitioners were as follows: Assets
Cash in banks
$ 106.65
Deposit on purchase of real estate
3,000.00
Automobile
1,990.00
Furs
2,500.00
Total Assets
$7,596.65
Liabilities
None
The amounts of adjusted gross income properly chargeable to the respective petitioners for the taxable years here involved are: 1944
$13,500.00
1945
14,249.55
1946
13,500.00
1948
71,441.80
1949
20,636.05
1950
9,401.32
1951
24,258.50
The failure of the respective petitioners to make or file a return for each of the years involved was not due to reasonable cause and was due to willful neglect, within the meaning of section 291(a) of the 1939 Code. The deficiency for each of the years involved is due to fraud with intent to evade tax, within the meaning of section 293(b) of said Code. The failure of the respective petitioners to make or file a declaration of estimated tax for each of the years involved was not due to reasonable cause and was *83 due to willful neglect, within the meaning of section 294(d)(1)(A) of said Code. For each of the years involved, there was a substantial underestimate of estimated tax, within the meaning of section 294(d)(2) of said Code, in an amount equal to the entire deficiency for each such year. Opinion I. The first issue for consideration is what amount of adjusted gross income is chargeable to the respective petitioners for each of the taxable years involved. Determinations of net income are not necessary; for the parties have stipulated that the standard deduction provided in the Code shall be applied in respect of each year, that any deficiencies (other than in additions to tax) for the years 1944 through 1946 shall be computed as in the case of a single person, and that those for the years 1948 through 1951 shall be computed as in the case of married persons who had filed joint returns. The controversy is primarily a factual one, which has been resolved in large part by our Findings of Fact. The respondent determined the deficiencies on the basis of adjusted gross income as reconstructed by use of the net worth method; and he regarded the increases in net worth from year to year, *84 to represent adjusted gross income of the years in which the increases occurred. The use of such net worth method for reconstructing taxable income has been approved by the courts in many cases. See, for example, Holland v. United States, 348 U.S. 121; Halle v. Commissioner, 175 Fed. (2d) 500 (C.A. 2), affirming 7 T.C. 245, certiorari denied 338 U.S. 949; Hague Estate v. Commissioner, 132 Fed. (2d) 775 (C.A. 2) affirming 45 B.T.A. 104, certiorari denied 318 U.S. 787. The burden of proof, to show error in the deficiencies so determined, is of course on the petitioners; although the burden of showing that any part of such deficiencies is due to fraud (an issue hereinafter considered) is on the respondent. The petitioners have conceded that use of the net worth method was proper; they have stipulated to the correctness of all assets included in respondent's net worth statement (plus one additional asset of $726 Government bonds sold in 1951 and held throughout all other years, which has no effect on the net worth increases); and they also have not disputed any of the liabilities, personal expenditures *85 and adjustments shown in said statement. Rather, their basic contentions are: (1) That as of December 31, 1947, the petitioner Sam Silver had, in addition to the assets shown in the net worth statement, an accumulation of cash on hand of approximately $138,000; (2) that this sum had been accumulated since 1928 from unreported gambling income, including income for the years 1944 and 1946 in amounts that are in excess of those determined by respondent; (3) that such cash on hand, rather than current taxable income, was the source from which the large investments in the Arizona Harness Racing Association were made in each of the years 1948 through 1951; and (4) that, pursuant to such contention, the incomes and deficiencies determined by the respondent for the years 1944 and 1946 should be increased; those for the years 1945 and 1948 should be reduced; and those for the years 1949 through 1951 should be entirely eliminated. We have weighed the foregoing contentions in the light of all the evidence; and the findings which we have made respecting the amounts of petitioner's income by years reflect the following considerations. (1) As regards the years 1944 through 1946, which are all *86 of the years involved in Docket No. 50943, the respondent determined the adjusted gross incomes primarily upon the basis of disclosures which petitioner made prior to the issuance of the notices of deficiency; and these were in the amounts of $2,238.21 for the year 1944, $14,249.56 for the year 1945, and $3,600 for the year 1946. At the trial, petitioner testified that, after giving further consideration to the amounts of his income, his best recollection was that his "annual earnings from gambling activities" during the period 1944 to 1948 were from "twelve to fourteen, fifteen thousand" dollars; and, on brief, he and his wife requested the Court to find that, "on the basis of additional evidence which has now been adduced," the adjusted gross income for each of the years 1944 through 1948 was $13,500. Such concessions of petitioners as to the amounts of income earned are in excess of the amounts determined by respondent for the years 1944 and 1946; and, accordingly, we have accepted them as to said years. Respondent has made claim to the increased deficiencies. As respects the year 1945, the respondent's determination of $14,249.56 falls within the range of petitioner's estimate *87 of between $12,000 and $15,000; and accordingly we approve the respondent's determination, on the ground that such determination is presumptively correct, and the petitioner has presented no evidence to show that it is erroneous. Thus, in accordance with our Findings of Fact, we hold that the amounts of adjusted gross income chargeable to the petitioners for the years 1944, 1945 and 1946 are $13,500, $14,249.56, and $13,500, respectively. (2) As regards the year 1948, petitioner contends, as before stated, that at the beginning of said year he had approximately $138,000 of cash on hand, which is not reflected in respondent's net worth statement. The only amount of cash which the respondent allowed him was "Cash in banks - $106.65." The respondent's determination is not without support; for the amount which he allowed is that originally supplied by the petitioners, and it is exactly equal to the agreed aggregate of petitioner's deposits in two Syracuse banks. Moreover, petitioner concedes that he has no records at all to support his new contention. In lieu thereof, he has relied on recollection and memory; and this has varied considerably from time to time, as shown by the differing *88 claims made in the original and amended petitions before this Court, and in petitioner's testimony. Nevertheless, we are convinced by other evidence, that the respondent's position is unrealistic and should not be sustained in its entirety. Petitioner had been engaged in gambling over a long period of time, had been a rather consistent winner, and had frequently acted as "banker" in card and dice games where it was necessary for him to have sufficient cash to cover the bets of all other participants. In 1946 and 1947 he operated a horse-booking establishment in Rochester, which must have required the use of some capital. And, at all times subsequent to July 1942, he had at least one and sometimes two safe deposit boxes, which he claims were used as cash depositories. Moreover, in June 1948, he invested $55,000 in the Arizona Racing Association; and prior to the close of said year, he increased such investment to $92,750. Although it is possible that all cash which he employed may have had its source in income of the particular year in which it was used, it seems probable to us that at least some of it represented accumulated unreported income from prior years. On the other hand, *89 we do not accept petitioner's testimony as credible, so far as it pertains to the amount of cash on hand as of December 31, 1947; for, after hearing his testimony and considering all of the evidence, we are convinced that he has little regard for the truth, and that the amount urged by him is considerably inflated. In this circumstance, we have used our best judgment, based on a study of all of the evidence; and, applying the rule of Cohan v. Commissioner, 39 Fed. (2d) 540, 544 (C.A. 2), we have concluded that, in addition to the assets shown in respondent's net worth statement, petitioner had cash on hand as of December 31, 1947, in the amount of $55,000. This amount is approximately equal to his entire admitted gross income for the 4 previous taxable years, and it also is equal to the entire initial investment which he made in the Arizona Racing Association in June 1948. After eliminating said amount from the increase in net worth which respondent determined for the year 1948, we have hereinbefore found as a fact, and we here hold, that the adjusted gross income of the petitioners for the year 1948 was $71,441.80. (3) As regards each of the years 1949, 1950 and 1951, *90 the petitioner contends that he had no taxable income whatever. He testified that the reasons for this were, that after his marriage he had invested most of his capital in Arizona Racing Association; and that he also had largely given up gambling in crap games, and had gone into betting on horses where his chances of winning were less certain. We are unwilling, however, to accept as credible the petitioner's statements that he had no income in any of said years. In all of these years he operated a gambling establishment in a Syracuse office building under the name of Ritz Recording Company, in which betting and booking were conducted on horse races, and also on other sporting events such as basketball and baseball. Moreover, he made yearly trips to Florida during the racing season; and while there, he incurred large personal expenditures, attended the races, and concededly won some of the bets which he made thereon. There is no record as to the transactions which he handled under the name of the Ritz Recording Company; and he refused to disclose the names of his associates in that business, who might have been able to supply information. Likewise, there is no evidence concerning *91 the operations of or possible income from the Arizona Racing Association; and as to this also, petitioner refused to disclose his associates. He conceded that he invested in this Association with a view to obtaining income therefrom, in place of that from other gambling activities. Mere general statements of a taxpayer, to the effect that he had no income, are not sufficient to overcome the presumptive correctness of the respondent's determinations. Cf. Halle v. Commissioner, supra. Accordingly, by reason of the petitioners' failure of proof, we hereby approve the amounts of the deficiencies determined by the respondent for each of the years 1949, 1950 and 1951. II. We next consider the issues respecting additions to tax. As regards additions to tax under sections 291(a) and 294(d)(1)(A), for failure to file income tax returns and for failure to file declarations of estimated tax, petitioners have conceded that such additions may properly be imposed in respect of each year for which there was sufficient income to require the filing of such a return or such a declaration. We have heretofore found as a fact that there was sufficient income for each of the several *92 years involved to require the filing of such instruments. Accordingly, we hereby hold that an addition to tax under each of said sections should be imposed for each of the taxable years here involved. As regards additions to tax under section 293(b), for fraud, this issue may be disposed of summarily. Petitioner conceded that as early as about 1940 to 1942, he was aware that income tax returns should be filed by him; but that after discussing the matter with an accountant who represented other gamblers, and also after discussing it with certain of his friends, he deliberately refrained from filing any return prior to 1952, for the purpose of concealing his income and his derelictions in failing to file returns for prior years. Also in 1940, he filed a sworn statement with the Selective Service Board, in which he deliberately falsified both his occupation and the amount of his income, so as to avoid any possibility that the amount of his true income might come to the attention of the Internal Revenue Bureau. We have heretofore held in Fred N. Acker, 26 T.C. 107, that the deliberate failure to file returns for the purpose of concealing income and of concealing prior *93 years' defalcations in filing returns, is sufficient to justify the imposition of additions to tax under section 293(b). Moreover, in the recent case of Schwarzkopf v. Commissioner, 246 Fed. (2d) 731, (July 10, 1957), affirming so far as pertinent T.C. Memo. 1956-155 [15 TCM 762], the Court of Appeals for the Third Circuit said: "Even if this case were devoid of the usual indicia of fraud, the consistent failure to report substantial amounts of income over a number of years, standing alone, is effective evidence of fraudulent intent. See Holland v. United States, supra at page 139; Lipsitz v. Commissioner, 220 Fed. (2d) 871 (C.A. 4, 1955), * * *" Also, the Court of Appeals for the Sixth Circuit, in its decision in Epstein v. United States, 246 Fed. (2d) 563 (July 2, 1957), held that "The consistent understatement of large amounts of income for a number of years is evidence of willful intent to evade." On the basis of all the foregoing, we have found as a fact that at least part of the deficiency for each year here involved is due to fraud with intent to evade tax, and we here hold that additions to tax under section *94 293(b) should be imposed for each of said years. As regards additions to tax under section 294(d)(2), we said in Fred N. Acker, supra, at page 114: "Section 294(d)(2) provides an addition to the tax for substantial underestimate of estimated tax. In G. E. Fuller, 20 T.C. 308, we approved the regulation (Regs. 111, sec. 29.294-1(b)( 3)(A)), which provides that in the event of a failure to file the required declaration, the amount of the estimated tax for the purposes of the above-mentioned section is zero; and we there approved also the imposition of sanctions under both section 294(d)(2) and section 294(d)(1)(A). We here follow our decision in the Fuller case. "We hold also, contrary to petitioner's contention, that respondent is not precluded from imposing the sanctions provided under section 294, concurrently with the sanction provided under section 291(a). Cf. Pincus Brecher, supra, [27 B.T.A. 1108]." For the reasons thus stated, we here hold that an addition to tax under section 294(d)(2) should be imposed for each of the years here involved. Decisions will be entered under Rule 50. Footnotes
*. Includes self-employment tax in the amount of $81.↩