Ben Burke and Bernice Burke v. Commissioner.
Burke v. Commissioner
Docket No. 53680.
United States Tax Court
T.C. Memo 1959-75; 1959 Tax Ct. Memo LEXIS 174; 18 T.C.M. (CCH) 363; T.C.M. (RIA) 59075; April 20, 1959
*174 Held, respondent's computation under the net worth method of petitioners' unreported net income was correct, with adjustments made as to several of the disputed items in accordance with the findings in the opinion; held, further, a part of the deficiencies for each of the years 1947 through 1951 was due to fraud with intent to evade tax; held, further, the return for the year 1947 was false and fraudulent with intent to evade tax; and held, further, additions to tax for the years 1947 and 1948 under sections 294(d)(1)(A) and 294(d)(2) of the I.R.C. of 1939 are sustained. Murray M. Weinstein, Esq., 37 Wall Street, New York, N. Y., for the petitioners. Henry L. Glenn, Esq., for the respondent. MULRONEY Memorandum Findings of Fact *175 and Opinion MULRONEY, Judge: Respondent determined deficiencies in the petitioners' income tax and additions to tax as follows: Additions to Tax (I.R.C. of 1939)
Year
Deficiency
Sec. 293(b)
Sec. 294(d)(1)(A)
Sec. 294(d)(2)
1947
$50,436.81
$25,218.40
$5,084.53
$3,050.72
1948
13,991.30
6,995.65
1,434.83
860.90
1949
5,512.54
2,756.27
333.93
1950
16,861.45
8,430.72
1,013.77
1951
8,067.72
4,033.86
492.34 In an amendment to his answer, the repondent claimed the following additional deficiencies and additions to tax for the years 1948 and 1950. Additions to Tax (I.R.C. of 1939)
Year
Deficiency
Sec. 293(b)
Sec. 294(d)(1)(A)
Sec. 294(d)(2)
1948
$13,010.20
$6,505.10
$1,027.43
$780.61
1950
725.58
362.80
43.55
The issues are: (1) Whether the petitioners had unreported income during the years 1947 through 1951; (2) Whether a portion of the deficiency for each of the years 1947 through 1951 was due to fraud with intent to evade tax within the meaning of section 293(b); (3) Whether the petitioners are liable for additions to tax for the years 1947 through 1951 under section 294(d); *176 and (4) Whether assessment and collection for the year 1947 are barred by the statute of limitations. Concessions made by the respondent on brief will be given effect in the Rule 50 computation. Findings of Fact Some of the facts have been stipulated and they are so found. Ben Burke and his wife, Bernice, are residents of Morristown, New Jersey. They filed joint income tax returns for the years 1947 through 1951 with the then collector of internal revenue for the fifth district of New Jersey at Newark, New Jersey. Ben Burke will hereinafter be called the petitioner. Petitioner was engaged in the practice of dentistry from 1930 to 1936 in Passaic, New Jersey, and in the middle of 1936 he moved his dental office to Morristown, New Jersey. Petitioner married Bernice in 1946 and since that date the petitioner's wife received no taxable income. In 1947 the petitioner was advised by his doctor to avoid excessive standing because of phlebitis of the left leg. In August 1948 the petitioner formed an equal partnership with a dentist named Murray Gruber. After the formation of the partnership the petitioner spent fewer hours in the office. Petitioner's income tax returns filed *177 for the years 1933 through 1939 showed no taxable income, while the returns filed by him for the years 1940 through 1945 disclosed nominal amounts of taxes to be due ranging from a minimum of $11.31 for the year 1940 to a maximum of $227.70 for the year 1945. Petitioner failed to report in his income tax returns for the years 1947 through 1951 interest on savings accounts, interest on redeemed United States Government E Bonds, and certain capital gains from the sale of stock and real estate owned by him. These unreported amounts of income were as follows: Capital
Year
Interest
Dividends
Gains
Total
1947
$ 262.07 $ $
$ 262.07
1948
17.96
336.00
353.96
1949
123.42
233.50
108.05
464.97
1950
2,428.82
196.00
2,624.82
1951
442.38
301.00
1,009.00
1,752.38
The amounts of net income reported by the petitioner and his wife in the returns for the years 1947 through 1951 were $3,136.15, $3,740.34, $4,075.99, $4,192.25 and $4,892.02, respectively. The gross receipts from dental practice shown on the 1947 joint income tax return filed by the petitioner and wife were $9.314 and the gross receipts reported by the partnership for *178 the years 1948 through 1951 were $13,745, $16,818, $16,116.45 and $18,780.11, respectively. Petitioner maintained a checking account during the years here involved with the Morristown Trust Company and one with The First National Iron Bank, both in Morristown, New Jersey. Petitioner's wife also had a checking account at the Morristown Trust Company. In addition, the petitioner had two checking accounts, one in a West Orange, New Jersey bank and one in a Newark, New Jersey bank, which checking accounts were in the care of his brother-in-law, Philip Yuttal, and under the brother-in-law's address. When the revenue agent first visited the petitioner's office he was shown a daily cash receipts book and several files of patients' cards. A comparison of the files with the cash receipts book revealed several discrepancies between what was indicated on the patients' cards and what was indicated on the cash receipts book. Therefore, the agent decided to make a closer check. Approximately two weeks later the revenue agent again visited the petitioner's office and was told by the petitioner's wife that she had destroyed the cash receipts book. She then showed the agent a new cash book showing *179 weekly receipts and these weekly totals agreed with the amounts of weekly deposits to the Morristown Trust Company. Petitioner's wife prepared the figures for the annual tax returns by taking the total of the bank deposits in the Morristown Trust Company for a particular year as the amount of gross receipts from the dental practice and she computed the disbursements and expenditures for that year by examining the checks drawn on the Morristown Trust Company. A portion of the receipts in each of the years 1947 through 1951 was not deposited in the bank. Some of the expenditures incurred by the partnership were not paid by checks drawn on the partnership account but were paid by the petitioner in cash, by treasurer's checks, with his own personal checks, or with cash obtained by discounting notes given to the partnership in payment of fees by patients. The Windsor House Furniture Company was organized in 1947 by petitioner and several other persons to engage in the retail furniture business in Boonton, New Jersey. In May 1950 the petitioner became the owner of all the outstanding stock of the corporation by purchasing stock owned by Morris Haberman for $21,500 and the stock owned *180 by Joseph Ehrenkrantz for $14,100. Petitioner borrowed $11,200 from the Morristown Trust Company in 1950 in order to make the payment for the stock he purchased from Haberman. In March 1951 the Windsor House Furniture Company paid the $11,200 obligation of the petitioner to the Morristown Trust Company, plus some accumulated interest. In the income tax return filed by the Windsor House Furniture Company for the fiscal year ending June 30, 1951, there was listed in the balance sheet the item "Due from officer - note" in the amount of $11,431.43. Respondent computed the petitioner's net income for the years 1947 through 1951 by using the net worth plus nondeductible personal expenditures method. In this computation the respondent established the petitioner's opening net worth, as of January 1, 1947, at $19,576.94, which included no opening cash on hand; bank deposits of $7,838.29; securities in the amount of $1,525; United States Savings Bonds, $1,500; office equipment, $6,527; and leasehold improvements, $2,186.65. The net worth increases computed by the respondent for the years 1947 through 1951 were $49,482.07, $5,730, $12,148.52, $25,401.85 and $15,126.81, respectively. The total *181 nondeductible personal expenditures of the petitioner, as computed by the respondent for these same years, were as follows: 1947
1948
1949
1950
1951
Disbursement from checking accounts
$24,946.77
$10,979.56
$ 7,804.86
$ 7,513.45
$ 5,442.14
Expenditures for life insurance premiums
3,133.65
21,942.97
2,090.80
11,176.91
2,005.05
Income Tax payments
321.22
2,623.41
714.00
463.00
419.00
Miscellaneous personal expenditures
2,950.00
(1,000.00)
43.00
3,069.89
Estimated daily living expenses
4,000.00
4,000.00
4,000.00
4,000.00
4,000.00
TOTAL
$35,351.64
$39,545.94
$13,609.66
$23,196.36
$14,936.08
The amounts in the above table which are identified as disbursements from checking accounts resulted from an analysis by a revenue agent of withdrawals by the petitioner from his various bank accounts of substantial amounts during the years 1947 through 1951. The revenue agent eliminated from the total withdrawals in each year those amounts which he could identify by relative date of payment and identity of amount as amounts used by the petitioner to pay taxes, insurance premiums, to transfer amounts from one bank account to another, *182 or to pay for assets which were already included in petitioner's net worth. The remaining balances, which appear in the above table, were included by respondent as nondeductbile personal expenditures of the petitioner in the reconstruction of the petitioner's corrected net income for the years 1947 through 1951. On the basis of the net worth plus nondeductible personal expenditures computation, the respondent computed the petitioner's unreported taxable income for the years 1947 through 1951 in the amounts of $81,775.56, $41,535.97, $21,682.19, $44,405.96 and $25,170.87, respectively. A part of the deficiencies for each of the years 1947 through 1951 was due to fraud with intent to evade tax. Petitioner's return for the year 1947 was false and fraudulent with intent to evade tax, and, therefore, assessment and collection for that year are not barred by the statute of limitations. Opinion We have in this case a procession of net worth computations, starting with the one attached to the statutory notice of deficiency, and ending with the one which the respondent finally develops on brief. Since the original computation has been considerably altered by a series of adjustments *183 and concessions, we will gear our discussion, for the most part, to the net worth computation in its final form as it appears in the respondent's brief. We think that the respondent was entirely justified in using the net worth method to compute the petitioner's income for the years 1947 through 1951. Apart from the bank records, some canceled checks and a collection of patients' record cards, the petitioner did not produce in evidence any books and records which would enable this Court to compute his income for those years from the practice of dentistry. There was some attempt by the petitioner to reconstruct his income through the patients' record cards. He computed the totals of his receipts for each of the years through the use of these record cards, which he said represented a complete record of his dental practice, and then sought to establish the similarity between these totals and the amounts of income reported by him on his returns for those years. It must be pointed out, however, that where the net worth computation shows increases in net worth greater than that reported on a taxpayer's returns, or is not consistent with his records, then the net worth computation is evidence *184 that there is unreported income and that the records, though seemingly complete on their face, are inadequate, inaccurate or false. Morris Lipsitz, 21 T.C. 917, affd. 220 Fed. (2d) 871, certiorari denied 350 U.S. 845. In view of the many changes made by the respondent in his reply brief in the net worth computation, which resulted in substantial changes in the petitioner's net worth for all of the years here involved, we reproduce here an analysis of such changes made by the respondent. This analysis will also pinpoint the basis for respondent's claims for increased deficiencies in the year 1948. 1946
1947
1948
1949
1950
1951
Net Worth as Now Established
$68,472.83
$94,550.01
$118,523.61
$130,806.01
$138,372.77
$180,628.67
Net Worth per Statutory Notice
19,576.94
69,252.44
75,174.98
87,830.42
116,123.59
131,482.78
Difference
$48,895.89
$25,297.57
$ 43,348.63
$ 42,975.59
$ 22,249.18
$ 49,145.89
Reconciliation of Differences
Additions: Nat'l Iron Bank Acct. #18405
$ 5,122.41
$ 17.46
Howard Savings Inst. #808780
5,134.46
193.15
Morris County Savings Bank
#79891
5,334.41
374.50
First Nat'l Iron Bank #14595
5,214.67
Morristown Trust Co. Checking
Account - Ben Burke
1,488.89
Morristown Trust Co. Acct.
#14167
5,398.09
Brown Rubber Co.
21.76
21.76
$ 21.76
Pacific Tin Consol. Co.
1,042.30
1,042.30
1,042.30
$ 1,042.30
$1,042.30
$ 1,042.30
New England Electric
1,118.40
1,118.40
1,118.40
1,118.40
1,118.40
1,118.40
International Hydro Electric
532.75
General Public Utilities
1,062.75
Furniture & Fixtures
150.00
Auto 1941 Hudson
1,150.00
1,150.00
Textron Corp.
8.15
8.15
8.15
8.15
8.15
Auto 1947 Buick
3,044.08
3,044.08
3,044.08
3,044.08
3,044.08
U.S. Gov't Bonds
14,625.00
14,625.00
14,625.00
14,625.00
750.00
Auto 1947 Willys Station Wagon
1,600.00
Machinery & Equipment
15,610.00
17,850.00
18,000.00
18,000.00
Auto 1951 Buick
2,901.89
Investment in Windsor House
Corp.
24,250.00
Loans Receivable
Katz
1,500.00
Windsor House Furniture
Corp.
3,000.00
Simkins
2,000.00
2,000.00
2,000.00
Speedwell Ave. Corp.
307.00
Accounts Receivable
Anthony Christiano
4,500.00
4,500.00
1,900.00
Total Addition
$48,895.89
$26,901.80
$ 43,569.69
$ 44,187.93
$ 25,862.93
$ 50,364.82
Deductions: Morristown Trust Co. Checking
Acct. - Ben Burke
$ 1,384.23
$ 104.06
Windsor House Furniture Co.
Investment
$ 2,500.00
Non-Taxable Income
220.00
117.00
$ 1,104.29
1,113.75
$ 209.93
Non-Taxable Portion of Capital
Gain
108.05
1,009.00
Total Deductions
$ 1,604.23
$ 221.06
$ 1,212.34
$ 3,613.75
$ 1,218.93
Net Difference
$48,895.89
$25,297.57
$ 43,348.63
$ 42,975.59
$ 22,249.18
$ 49,145.89
*185 These changes result in the following increases in petitioner's net worth for the years 1947 through 1951: 1947
1948
1949
1950
1951
Net Worth Current Year
$94,550.01
$118,523.61
$130,806.01
$138,372.77
$180,628.67
Net Worth Prior Year
68,472.83
94,550.01
118,523.61
130,806.01
138,372.77
Increase in Net Worth
$26,077.18
$ 23,973.60
$ 12,282.40
$ 7,566.76
$ 42,255.90 A comparison of the petitioner's net worth increases as shown by the respondent in the notice of deficiency with the net worth increases newly computed by the respondent in his reply brief shows the following changes: 1947
1948
1949
1950
1951
Net Worth increases per statutory notice
$49,675.50
$ 5,922.54
$12,655.44
$28,293.17
$15,359.19
Net Worth increases now established
26,077.18
23,973.60
12,282.40
7,566.76
42,255.90
Increase or (decrease)
($23,598.32)
$18,051.06
($ 373.04)
($20,726.41)
$26,896.71
In the original net worth computation the respondent, in computing the unreported net income, added nondeductible personal expenditures to the increases in net worth for the years 1947 through 1951 in the amounts of $35,351.64, *186 $39,545.94, $13,609.66, $23,196.36, and $14,936.08, respectively. He reduced these amounts considerably in the revised net worth computation in his reply brief, and using these revised amounts, together with the revised net worth figures explained above, the respondent computed the following amounts of unreported net income. [1]
1947
1948
1949
1950
1951
Revised Increases in Net Worth
$26,077.18
$23,973.60
$12,282.40
$ 7,566.76
$42,255.90
Add: Nondeductible Expenditures
24,302.21
33,120.12
6,661.25
14,700.49
10,691.44
Corrected Net Income
$50,379.39
$57,093.72
$18,943.65
$22,267.25
$52,947.34
Net Income Reported
3,136.15
3,740.34
4,075.99
4,192.25
4,892.02
Unreported Net Income
$47,243.24
$53,353.38
$14,867.66
$18,075.00
$48,055.32
The year 1947 is barred by the statute of limitations unless we find that the return filed by the petitioner was false and fraudulent with an intent to evade tax. Section *187 276(a). [2] The burden to establish fraud is on the respondent and we hold, later in the opinion, that he has met such burden. We will, therefore, delay our discussion of the fraud issue until we reach that portion of the opinion. Petitioner has the burden of proof to overcome the presumption of correctness which attaches to the respondent's determinations of deficiencies for the years 1947 through 1951. In two of the years before us, 1948 and 1950, the respondent made claims for additional deficiencies and additions to tax. For the year 1948 the respondent, by amended answer, made a claim for an increased income tax deficiency in the amount of $13,010.20, and he explained this increase by alleging that the "proof adduced at the trial * * * establishes that the total correct net income of the petitioners for the year 1948 is $68,607.15, rather than the $44,468.48 determined by the respondent in the statutory notice of deficiency." In his reply brief the respondent concedes that the total correct net income for 1948 is not more than $57,094.72. For the year 1950 the respondent, also by amended answer, made a claim for an increased income tax deficiency in the amount of $725.58, and he *188 explained this increase by alleging that the "proof adduced at the trial * * * establishes that the total correct net income of the petitioners for the year 1950 is $50,528.48, rather than the $49,177.03 determined by the respondent." However, in his reply brief the respondent concedes that the total correct net income for 1950 is not more than $22,267.16. It is apparent, therefore, that the respondent has the burden to prove the increased deficiency in petitioner's income tax for the year 1948. This increased deficiency is based upon the respondent's claim that the petitioner's total correct net income for that year is $12,626.24 ($57,094.72 minus $44,468.48) more than the amount originally set forth by respondent in the notice of deficiency. An examination of the respondent's revised net worth computation above reveals that this increase is explained largely by the "Machinery and Equipment" asset which respondent lists for the first time among petitioner's assets as of December 31, 1948. We shall discuss this item, together with other items disputed by the petitioner, in *189 the following portion of the opinion. We have seen that the respondent, in his reply brief, made a reduction in petitioner's total nondeductible personal expenditures for 1948 in the amount of $6,425.82 ($39,545.94 minus $33,120.12), and, consequently, none of the claims for increased deficiency for 1948 is attributable to this source. Petitioner challenges the respondent's net worth computation in several respects. Petitioner contends that he had cash on hand of $89,000 as of January 1, 1947. He contends that there should be included among his assets as of January 1, 1947, loans receivable from Morris Haberman in the amount of $12,000, Joseph Katz in the amount of $1,500, Samuel Binder in the amount of $1,000, Joseph Honixfeld, $200, Eugene Valerio, $200 and Morris Cohen, $2,500; as of January 1, 1948, loans receivable from Morris Haberman, $9,000, Windsor House Furniture Company, $3,000, and Joseph Simkins, $2,000; as of January 1, 1949, loans receivable from Morris Haberman, $2,000, Joseph Simkins, $2,000, and Anthony Christiano, $4,500; as of January 1, 1950, Joseph Simkins, $2,000, and Anthony Christiano, $4,500. Petitioner also argues that there were several small amounts owed *190 to him at various times during these years by the 124 Speedwell Avenue Corporation, a launderette in which he had an interest. He also contends that there were several short term or accommodation loans receivable by him at various times during these years, apart from the loans receivable listed above, from Joseph Katz, Windsor House Furniture Company, the launderette, Joseph Simkins, Irvin Braunstein and Morris Haberman. Petitioner contends that the respondent in his net worth computation failed to include a liability, as of December 31, 1951, in the amount of $11,234.84, representing an indebtedness to the Windsor House Furniture Company. Petitioner also disputes the amounts of dental machinery and equipment included by the respondent in the net worth computation in each of the years 1948, 1949 and 1950. Petitioner also disputes the correctness of certain capital gains from the sale of real estate in 1951, and the correctness of an increase, shown by respondent in the net worth computation as of December 31, 1951, in petitioner's investment in the Windsor House Furniture Company. Finally, the petitioner objects to the respondent's identification as nondeductible personal expenditures *191 of certain unidentified withdrawals by the petitioner from his bank accounts in the years 1947 through 1951. We shall treat these disputed items separately in the following paragraphs. Petitioner makes the contention that he had currency on hand in the amount of $89,000 on December 31, 1946, of which approximately $28,000 was received by him from his father in 1942 and the balance accumulated from the petitioner's dental practice from 1930 through 1945. We have studied the evidence on this point and conclude that the petitioner had no more than $5,000 cash on hand as of that date. An examination of the net worth computation shows that the petitioner, on December 31, 1946, is credited with more than $16,000 in United States Government bonds, as well as approximately $35,000 in various bank accounts and checking accounts. Petitioner's income tax returns filed for the years 1933 through 1939 showed no taxable income, and the returns filed for the years 1940 through 1945 show nominal amounts of tax as due, from a low of $11.31 for the year 1940 to a high of $227.70 for the year 1945. When we consider petitioner's living and other personal expenses over the years 1930 through 1945, his *192 investments, his payments of insurance premiums, his bank deposits and Government bonds, we think it would have been impossible for the petitioner to accumulate, in addition, currency in the amount of $89,000. Respondent carefully reconstructed the petitioner's income during these years prior to 1947, using the filed income tax returns as a basis for the reconstruction, and found that they indicated total income available to the petitioner in the entire period 1930 through 1946 in the amount of $35,602.18. Then respondent estimated that the petitioner in this same period made expenditures and investments of approximately $123,000. Now the petitioner would have us believe that, over and above this, he saved $89,000 in currency. We have also studied the evidence on the alleged gift to him in 1942 of $28,000 in currency by the petitioner's father. The evidence on this point is extremely vague and unsatisfactory, and we do not find it at all persuasive. Petitioner testified that his father had this money in a safe and that the father gave this money, amounting to $28,000 in cash, to the petitioner in 1942, just prior to the father's second marriage, in order to prevent the second wife *193 from inheriting that money. Petitioner's sister testified that she saw a stack of bills in the father's safe sometime in 1938, and that as a result of conversations she assumed there was "$28,000 or $30,000" in the safe at that time. We do not know that this amount, even if it existed in 1938, was still there in 1942. Moreover, it strikes this Court as odd that the father, with seven children, should turn all the money over to the petitioner. It is quite likely, however, that the petitioner did have some small amount of currency on hand on December 31, 1946. It was developed in the evidence that during the years 1947 through 1951 the petitioner and his wife were constantly making withdrawals from the bank or were buying treasurers' checks for various purposes, or had on hand fees paid by patients which were not deposited. It is not unlikely that this was done prior to 1947 as a common practice. Consequently, we hold, on the basis of all the evidence, that the petitioner had currency on hand on December 31, 1946 in the amount of $5,000. Petitioner also claims that on January 1, 1947 he had several loans receivable from several parties. Respondent, on brief, concedes that a loan *194 of $1,500 was receivable from Joseph Katz on that date, since it was corroborated by Katz, who was called as a witness. We agree with respondent that alleged loans, purportedly outstanding on January 1, 1947, to Samuel Binder, Joseph Honixfeld and Eugene Valerio in the respective amounts of $1,000, $200 and $200 were not established. There is absolutely no record or other evidence, apart from the petitioner's recitation of these amounts, to show that these loans existed. Petitioner also claims he made a loan in 1947 to Morris Haberman in the amount of $12,000, but we have the testimony of Haberman that he received this money in January 1948 and only in the amount of $10,000. In the same year $8,000 was repaid to the petitioner by Haberman, and the balance was repaid in 1949. We believe Haberman, and, consequently, reject the petitioner's contention as to this particular loan. It is significant that this entire transaction, both the loan and the repayment, was carried out in cash. Petitioner claims an account receivable from Morris Cohen as of January 1, 1947 in the amount of $2,500. Petitioner and Cohen apparently had a joint account with a broker for the purchase of stock and we *195 have in evidence a transcript of this account recording the purchases and sales of various stocks. Petitioner testified that some time in 1946 there was some kind of an accounting made by Cohen to him and that as a result of such accounting Cohen owed petitioner "around $2,500" as of December 31, 1946. There is nothing to support this purported accounting. Moreover, an examination of the opening net worth shows that the respondent has included among petitioner's assets certain securities mentioned in the brokerage account. These securities are shown at a value in excess of $2,500 as of December 31, 1946. We believe that this represents accurately the nature of the petitioner's interest in the stock venture. Respondent has included among petitioner's assets, as of December 31, 1947, the amount of $307 as a loan receivable from the Speedwell Avenue Corporation. We hold that this amount is correct. A $3,000 loan to the Windsor House Furniture Company and a $2,000 loan to Joseph Simkins, claimed by the petitioner, have been allowed by the respondent as of December 31, 1947. In addition, the respondent has allowed a loan receivable from Anthony Christiano as of December 31, 1948, in the *196 amount of $4,500. This particular loan was substantiated by Christiano, who was called as a witness. As to repayment of this loan, we can only gather from the record that it was repaid "at intervals during the years '50 and '51", and, consequently, in the net worth computation, this repayment should be allocated evenly over those years. Petitioner also makes a blanket assertion that there were other loans outstanding at various times. There is absolutely no proof which would enable us to hold that these loans receivable actually did exist. The petitioner is extremely vague as to most of these loans, especially so in the case of certain purported "accommodation" loans, and, in fact, states on brief that "although there is no specific proof that any of these loans were outstanding as of the first day of any tax year, it is reasonably possible that such receivables existed at the beginning of each tax year." With the record in this condition we must reject his claim for these purported loans receivable. One of the assets listed by the respondent for the year 1947 in the net worth computation is a 1947 Buick. Petitioner claims that this was transferred to him by Haberman in part repayment *197 of a loan made by petitioner to Haberman. However, Haberman expressly denied that this was so but instead testified that the petitioner paid the full price for this Buick to Haberman, who, in turn, had obtained it from the automobile agency. This testimony by Haberman agrees with the testimony to the effect that the loan was made by the petitioner to Haberman in 1948 and not, as petitioner alleges, some time in 1947. We hold that the respondent was correct in listing this car with petitioner's assets in 1947. Petitioner claims that on December 31, 1951 he owed to the Windsor House Furniture Company the amount of $11,234.84. Petitioner borrowed $11,200 from the Morristown Trust Company in 1950 in order to buy out the other stockholders in the Windsor House Furniture Company, and this amount was included by the respondent as a liability in the net worth computation as of December 31, 1950. This loan was repaid to the bank in 1951 by the Windsor House Furniture Company by a check in the amount of $11,234.84, which included a small amount of interest. It is the petitioner's contention that the net result of all this is that his obligation to the bank was replaced by an obligation to *198 the corporation and that, consequently, the liability to the corporation should be included in computing his net worth as of December 31, 1951. Respondent argues that the petitioner has not established the existence of an obligation to the corporation and also that "there is no proof that the payment by Windsor was a loan to [the petitioner] as distinguished from a dividend." We have the petitioner's testimony that the corporation paid off his obligation to the bank in 1951. We also have corroborating evidence in the corporation income tax return filed by the Windsor House Furniture Company for the fiscal year ending June 30, 1951, which shows in the balance sheet the item "Due from officer - note" in the amount of $11,431.43, which amount apparently includes other small items not material here. We also have petitioner's testimony that this obligation to the corporation was not repaid during 1951, and, indeed, such repayment would be extremely unlikely in that same year. We have examined all the evidence on this item and are persuaded that the petitioner has met his burden of proof in establishing the existence of a liability in the amount of $11,234.84 to the Windsor House Furniture *199 Company as of December 31, 1951. Another dispute centers upon the amount of equipment owned by the petitioner at the end of 1948. In the original net worth computation the respondent shows office equipment in the amounts of $6,527 and $5,785.80 on January 1, 1947 and 1948, respectively. In the final net worth computation, developed by the respondent on brief, he shows machinery and equipment in the amount of $15,610 as of the end of 1948; $17,850 as of the end of 1949; and $18,000 as of the end of 1950 and 1951. Respondent's only grounds for these additions are financial statements submitted by the petitioner to two banks for the purpose of obtaining loans. Respondent's claims for increased deficiencies in 1948 are based largely on this purported increase in petitioner's assets by the end of that year. Respondent has the burden of proof for such increased deficiencies, and we do not believe he has met his burden. Petitioner denies the purchase of any new equipment in 1948. We know that in that year the petitioner took into partnership with him another dentist who brought with him approximately $6,000 of equipment. This appears to equal in amount the equipment owned by the petitioner *200 in 1946 and 1947 and in view of the fifty-fifty arrangement made by the two dentists, we think it is only logical that the equipment contributed by the two would be similar in amount. Petitioner sought to be relieved of some of his duties by bringing in a partner, and it would be extremely unlikely that at this juncture he would suddenly make a substantial purchase of new dental equipment. We have examined the evidence on this point, and, while it is not too satisfactory, we conclude that the respondent was wrong in attributing to the petitioner the purchase of new equipment in the year 1948. This holding will, of course, affect the years 1949, 1950 and 1951, since the item "Machinery and Equipment" appears in all the years. Another disputed item is the amount of gain realized from the sale of certain real estate by the petitioner. It is now agreed by the parties that this sale took place in 1951, not in 1950. Also, the parties are in agreement that the original cost basis of this real estate was $9,382 and that the selling price was $12,000. Respondent has taken into account a broker's commission $600of, and, consequently, he has determined a long-term capital gain realized from *201 the sale in the amount of $2,018. In the net worth computation which appears in his brief, the respondent has made the proper adjustment in 1951 for the 50 per cent portion of this gain which is not taxable. The petitioner argues that there were certain additional expenses incurred during the years 1947 through 1951 which must be added to the cost basis. Again, the evidence on this is virtually worthless. Petitioner claims that he paid real estate taxes for four years on this property, which were never deducted, and that certain other expenses were incurred which likewise were never deducted. It is not clear whether the petitioner is now seeking to capitalize expenditures which should have been deducted in the years when they were incurred. Certainly, real estate taxes are deductible in the year when paid. Nor are we shown that the petitioner actually failed to deduct these expenses currently. As for the other expenditures mentioned by the petitioner, we have not been shown what they were or when incurred. Petitioner mentions attorneys' fees of " $70 to $75" in connection with the sale of the real estate in 1951 but he goes on to say that these were paid by the Windsor House Furniture *202 Company and not by himself. Petitioner has not established to our satisfaction that any of the amounts claimed by him should be included in the basis of the real estate. On the basis of all the evidence we hold that the respondent correctly computed the amount of gain realized from this sale. In the net worth computation prepared by the respondent in his reply brief, he shows an increase of $24,250 in the petitioner's investment in the Windsor House Furniture Company, or a total investment in this corporation of $108,700 as of December 31, 1951. In the original net worth computation the respondent showed this investment by the petitioner in the corporation on December 31, 1949, 1950 and 1951 in the amounts of $46,350, $84,450 and $84,450, respectively. Respondent failed to amend his answer to claim any increase in the petitioner's deficiency for the year 1951. Rule 17, Rules of Practice. Respondent merely states in his reply brief that "a claim for an increased deficiency for 1951 based upon an increase in net worth for that year as established by the record is hereby made." Absent a proper amendment to the answer for the year 1951, we do not consider this claim for an increased *203 deficiency is properly before us. However, even if we should examine it on its merits, the respondent's contention must fail. He has the burden of proof on this new matter, and we do not think that he has met it. Respondent relies upon the petitioner's statement, developed on cross-examination, that "the amount invested in Windsor shares" at the end of 1951 was $108,700. We have examined this testimony and find that it is very vague and inconclusive. Even if we should accept this figure as correctly representing the petitioner's total investment in the corporation as of the end of 1951, we have absolutely no evidence to show that this increase took place in 1951. It might just as easily have taken place in 1950. In the state of the record any attempt to place this increase in a particular year would be a mere conjecture. In his original net worth computation the respondent made an analysis of the petitioner's living and other nondeductible expenditures for the years 1947 through 1951, which we reproduce here in summary form: 1947
1948
1949
1950
1951
Unexplained disbursements from checking
accounts
$24,946.77
$10,979.56
$ 7,804.86
$ 7,513.45
$ 5,442.14
Expenditures for Insurance Premiums
3,133.65
21,942.97
2,090.80
11,176.91
2,005.05
Income Tax Payments
321.22
2,623.41
714.00
463.00
419.00
Legal Fees, personal
1,000.00
Morristown furriers (cash)
43.00
118.00
Automobiles
2,950.00
(1,000.00)
1,951.89
Living expenses
4,000.00
4,000.00
4,000.00
4,000.00
4,000,00
Total
$35,351.64
$39,545.94
$13,609.66
$23,196.36
$14,936.08
*204 As a result of evidence produced at the trial and certain concessions made by the respondent on brief, the above total personal and nondeductible expenditures were reduced to $24,302.21, $33,120.12, $6,661.25, $14,700.49 and $10,691.44 in the years 1947 through 1951, respectively. The respondent eliminated in each year the separate item for living expenses in the amount of $4,000, with the explanation that such living expenses should be deemed as coming out of the unexplained disbursements from the petitioner's various checking accounts, which appears as a separate item in the above table. Respondent also eliminated from the unexplained withdrawals several amounts which the petitioner was able to identify as bank transfers, payments of insurance premiums already included in the above table, amounts identified as lab payments but only to the extent such payments exceeded the deductions already claimed on the petitioner's income tax returns and certain other items. Respondent also eliminated the amounts shown as expenditures for automobiles in the years 1947 and 1951, since such items were included elsewhere in the petitioner's net worth. A summary of these changes is as follows: *205 1947
1948
1949
1950
1951
Personal Living Expenses as Now Estab-
lished
$ 24,302.21
$33,120.12
$ 6,661.25
$14,700.49
$10,691.44
Personal Living Expenses per Statutory
Notice
35,351.64
39,545.94
13,609.66
23,196.36
14,936.08
Differences
[11,049.43)
[6,425.82)
[6,948.41)
[8,495.87)
[4,244.64)
Reconciliation of Differences
Additions: Loss on Sale of 1947 Willys
$ 1,000.00
Total Additions
$ 1,000.00
Deductions: Cost of 1947 Buick
$ 2,500.00
Cost of 1947 Willys
450.00
Cost of 1951 Buick
$ 1,951.89
Excess Laboratory Fees paid by
other than partnership checks
$ 3,948.41
$ 3,016.67
2,292.75
Excess Laboratory Fees paid over
Amount reported on tax returns
792.43
$ 2,383.92
Payment to Reliable Dry Cleaning,
Inc. - Loan to Speedwell Corp.
257.00
Life Insurance Premiums
1,479.20
Disbursements from checking account
(office stationery)
$ 41.90
(Transfers)
$ 1,250.00
(Deposit Headly St. Property)
900.00
(Stock Windsor House)
900.00
Personal Living Expenses
4,000.00
4,000.00
$ 4,000.00
$ 4,000.00
$ 4,000.00
Total Deductions
[11,049.43)
[6,425.82)
[7,948.41)
[8,495.87)
[4,244.64)
Net Differences
[11,049.43)
[6,425.82)
[6,948.41)
[8,495.87)
[4,244.64)
*206 There still remain, after these adjustments, unexplained disbursements, mostly from checking accounts, which the respondent has included as part of the petitioner's personal and nondeductible expenditures. Diligent work on the part of the respondent's agent failed to connect such disbursements with any of the petitioner's known expenditures or investments. Petitioner does little more than state that these disbursements were for the purpose of paying "taxes, insurance premiums, investments, and transfers of amounts of money to Mrs. Burke's checking account, shortterm loans, exchange of checks - very few were used for living expenses, very few." But these possibilities have been explored and we are persuaded that all disbursements which went into these categories have been eliminated. No canceled checks have been produced. We think that the respondent has established that, apart from the amounts traced to specific expenditures and investments which appear elsewhere in petitioner's net worth, the amounts withdrawn from the bank accounts were expended on personal nondeductible expenditures, and we hold that the respondent is correct in including the unexplained disbursements from the *207 petitioner's various accounts in the total nondeductible expenditures for the years here involved. Petitioner contends that his wife received gifts of currency, clothing and fur coats from Morris Haberman during the years here involved and that such gifts should be eliminated from the net worth computation. Haberman denied making such gifts. We cannot find anything in the record to establish these gifts, and consequently, hold that the petitioner has failed to meet his burden of proof on this item. The petitioner also failed to meet his burden of proving certain losses which he says he incurred during these years. Such claims, it should be pointed out, were extremely vague and inconclusive. We have examined the petitioner's arguments and evidence carefully and, on the basis of the entire record, we hold that the petitioner's unreported net income as determined by the respondent's revised net worth and with the adjustments made in the course of this opinion, is correct. Respondent determined that a part of the deficiencies for each of the years 1947 through 1951 was due to fraud with intent to evade tax. The burden rests upon the respondent to prove fraud by clear and convincing *208 evidence, Arlette Coat Co., 14 T.C. 751, and we believe that he has carried that burden for each of the years here involved. Respondent established that there were consistent understatements of income by the petitioner in substantial amounts in his income tax returns for these years and such understatements are evidence of fraud. Schwarzkopf v. Commissioner, 246 Fed. (2d) 731, affirming a Memorandum Opinion of this Court [15 TCM 762, T.C. Memo. 1956-155]. Petitioner actually admits that some of the receipts from the dental practice were not reported as income, either by the partnership or on his own income tax returns. He explains this by saying that sizable payments were made out of such unreported receipts for laboratory expenses, which weren't claimed as deductions, thus washing out the unreported receipts. We consider such explanation as quite weak. Petitioner was intelligent, well educated, and a professional man. He was interested in at least two outside commercial ventures during these years and, in connection with a retail furniture enterprise, he ended up sometime in 1950 or 1951 with an investment of approximately $100,000. He was *209 also engaged in an investment program during part of this period. It is obvious to us that the petitioner, with this evidence of a mounting net worth before him during these years, must have been aware that he was not reporting all of his income. There were also specific items of income which were omitted from the petitioner's income tax returns for the years 1947 through 1951, including dividends, interest income and capital gains, in the total amounts of $262.07, $353.96, $464.97, $2,624.82 and $1,752.38, respectively. We also take note of the petitioner's lack of cooperation with the respondent during the investigation. In fact, it would seem that the petitioner, in some instances, deliberately sought to mislead the respondent. Petitioner destroyed a cash receipts book after the first visit by the revenue agent. It had been destroyed when the agent requested it on his second visit two weeks later. Instead of the daily cash receipts book, the petitioner's wife produced a new cash book showing weekly receipts, and these weekly totals dovetailed with the weekly deposits in the Morristown Trust Company. Also, despite repeated requests, the petitioner never produced any of the records *210 of the furniture corporation in which he had made a substantial investment. It is also noteworthy that the petitioner made deliberate misstatements in the corporation's income tax returns as to the ownership of interests in said corporation, apparently to make it appear that his interest was much less than it actually was. Petitioner also opened bank accounts in other cities in care of his brother-in-law and both accounts were opened with deposits of currency. We think, on the basis of the entire record, that a part of the deficiency for each of the years 1947 through 1951 was due to fraud with intent to evade tax. Our finding that the income tax return filed by the petitioner for the year 1947 was false and fraudulent with intent to evade tax disposes of the statute of limitations issue raised by the petitioner with respect to that year. Section 276(a). Respondent determined that the petitioner was liable for additions to tax under section 294(d)(1)(A) for failure to file a declaration of estimated tax for the years 1947 and 1948 and under section 294(d)(2) for substantial underestimates of his estimated tax for the years 1947 through 1951. In an amendment to his answer the respondent *211 claimed increased additions to tax under sections 294(d)(1)(A) and 294(d)(2) for 1948 and under section 294(d)(2) for 1950. Respondent, on brief, concedes that the additions to tax "under section 294(d)(2) for substantial underestimate of estimated tax for the years 1949, 1950, and 1951 appear to be incorrect and should be eliminated". We have not been shown by the petitioner that his failure to file the declarations of estimated tax for the years 1947 and 1948 was due to reasonable cause and not to wilful neglect, and, consequently, as to the claimed addition to tax under section 294(d)(1)(A) we must uphold the respondent. We also uphold the additions to tax claimed by the respondent for the years 1947 and 1948 under section 294(d)(2). G. E. Fuller, 20 T.C. 308, affirmed on other issues, 213 Fed. (2d) 102. Decision will be entered under Rule 50. Footnotes
1. The amounts of unreported net income originally computed by the respondent in his notice of deficiency were $81,775.56, $41,535.97, $21,682.19, $44,405.96, and $25,170.87 for the years 1947 through 1951, respectively.↩
2. All section references are to the Internal Revenue Code of 1939, as amended, unless otherwise noted.↩