CHARLES V. CARR and HORTENSE CARR, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Carr v. Commissioner
Docket No. 5681-75.
United States Tax Court
T.C. Memo 1978-408; 1978 Tax Ct. Memo LEXIS 109; 37 T.C.M. (CCH) 1695; T.C.M. (RIA) 78408; October 11, 1978, Filed James W. Head and John Kennedy Lynch, for the petitioners. Larry L. Nameroff, for the respondent. TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Judge: Respondent determined the following deficiencies in income tax and additions to tax: Addition to Tax Year
Deficiency
Section 6653(b) [1]
1967
$ 53,838.52
$ 26,919.26
1968
43,007.79
21,503.90
1969
32,903.75
16,451.88
1970
23,855.72
11,927.86
The issues remaining for decision are: (1) whether petitioners had unreported taxable income during the years in question; (2) if so, whether any portion of such understatement was due to fraud on the part of Charles V. Carr; [2] and (3) whether the deficiencies are barred by the statute of limitations. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. *111 The stipulation of facts and the exhibits attached thereto are incorporated herein by reference. Charles V. Carr (hereinafter Carr) and Hortense Carr are husband and wife whose residence was Cleveland, Ohio, at the time of the filing of the petition herein. They filed joint Federal income tax returns for the taxable years 1960 through 1970 with the district director of internal revenue, Cleveland, Ohio. Petitioners have two children, Leah P. Carr (Leah) and Cathleen V. Carr (Cathleen), both of whom were under thirteen years of age during the taxable years at issue. In addition, Carr has two children from a previous marriage. Carr has been a practicing attorney in Cleveland, Ohio, for approximately fifty years. His practice has been primarily in the area of criminal and real property law. Throughout this period, he has been active in local politics and for thirty years he was a member of the Cleveland City Council. In addition, he was an active member of his church and such civic associations as the Masonic Lodge, the NAACP, and the Urban League. At the time of trial, Carr was a trustee of the Regional Transit Authority.During the taxable years at issue, he was President *112 of Quincy Savings and Loan Company (Quincy S&L) and a member of its Board of Directors. In addition to income from his legal practice and from his positions at Quincy S&L, Carr had income during the taxable years at issue from dividends, interest, rents and gains realized from transactions in securities and real estate. Shirley Brown was employed by Carr in 1964 to keep certain records, answer the telephone, and collect fees, and she continued to be so employed at least through 1969. In particular, she recorded the income from Carr's law practice either when the fees were paid to her or when Carr informed her that fees had been paid to him directly. Most of the payments recorded were made to her in Carr's office. Mrs. Brown was active in the management of Carr's real estate operations. Tenants would pay their rent to her, usually in cash, for which she would issue receipts. As with the legal fees, some rent payments were made directly to Carr, and Mrs. Brown recorded these payments when she was informed of them. In addition, she often arranged to have repairs made to the rental properties, and prepared checks used in payment of utility bills and the repairs. Although records *113 of income and expenses were kept, formal accounting books were not maintained. Petitioners' Federal income tax returns for the taxable years at issue were prepared by John E. Washington, who, during that period, was engaged in the private practice of law at the same location as Carr, although they were not partners. In preparing the returns, Washington used W-2 Forms as the basis for reported wages, 1099 Forms supplied by Carr as the basis for reported interest and dividends, and records prepared by Mrs. Brown as the basis for the reported income and expenses from Carr's legal practice and rental properties. The depreciation claimed with respect to the rental properties was based on the amounts claimed in the prior year's return. Capital gains and losses were calculated from the selling prices of sales which Carr reported to Washington. Washington did not inquire as to the existence of additional sales of securities. Petitioners reported adjusted gross income on their U.S. Individual Income Tax Returns as follows: Year
Adjusted Gross Income
1967
$ 44,868.40
1968
38,604.31
1969
44,779.86
1970
39,997.52
In these returns, petitioners reported items *114 of gross income as follows: Item of Gross Income
1967
1968
1969
1970
Wages
$ 16,499.88
$ 16,800.04
$ 18,100.00
$ 22,099.92
Gross Dividends
5,636.26
6,139.46
6,312.11
9,235.86
Interest Income
2,877.70
4,124.43
10,467.75
3,067.59
Other Income
7,328.42
8,055.10
0
0
Gross Receipts, Schedule C
22,493.23
12,553.58
6,979.10
10,229.00
Gain from the Sale of Assets,
Schedule D
6,128.62
5,010.57
30,952.32
0
Gross Receipts from Rent
7,660.00
8,235.00
6,532.50
4,175.00
TOTAL
68,624.11
60,918.18
79,343.78
48,807.37
Petitioners' bases in assets, liabilities, and net worth as of December 31 for each of the years listed are as follows: 1966
1967
1968
1969
1970
ASSETS
Cash on hand
$ 47,510.62
$ 59,241.87
$ 40,191.87
$ 36,316.87
$ 31,374.00
Checking and Savings
Accounts
17,523.33
22,722.91
58,926.36
64,911.81
25,744.33
Certificates of Deposit
89,000.00
140,500.00
149,500.00
157,500.00
100,000.00
Stocks and Bonds [1]
118,008.46
155,957.60
165,338.81
228,732.89
356,552.23
Automobiles
8,129.86
10,923.27
13,324.21
13,324.21
13,127.59
Real Estate
60,822.30
51,996.32
51,996.32
55,702.20
58,202.20
Improvements to Real
Estate
0
3,100.09
4,566.66
11,623.50
25,391.08
Other Assets
12,924.15
13,131.61
12,832.38
11,264.06
11,264.06
Total Assets
$ 353,918.72
$ 457,573.67
$ 496,676.61
$ 579,375.54
$ 621,655.49
LIABILITIES
Reserves for depreciation: Autos $ 1,280.00 $ 2,016.20 $ 1,289.88 $ 3,010.58 $ 473.59
Real Estate
7,673.69 [2]
6,255.02
7,276.35
4,462.27
6,213.39
Deferred Profit Install-
ment Sale
1,358.89
1,232.29
1,158.38
0
0
Total Liabilities
$ 10,312.08 $ 9,503.51 $ 9,724.61 $ 7,472.85 $ 6,686.98
NET WORTH
$ 343,606.64
$ 448,070.16
$ 486,952.00
$ 571,902.69
$ 614,968.51
Increase in Net Worth
$ 104,463.52
$ 38,881.84
$ 84,950.69
$ 43,065.82
*115 Petitioners incurred personal living expenses and nondeductible losses during the taxable years at issue of at least the following amounts: 1967
$ 22,474.84
1968
37,951.35
1969
29,762.24
1970
27,127.51
The computation of petitioners' adjusted gross income based upon their net worth as found herein is as follows: Item
1967
1968
1969
1970
Increase in Net Worth
$ 104,463.52
$ 38,881.84
$ 84,950.69
$ 43,065.82
ADJUSTMENTS
Personal Living Expenses and
Non-Deductible Losses
22,474.84
37,951.35
29,762.24
27,127.51
Nontaxable Portion of Capital
Gains
23,071.49
2,257.65
13,263.00
0
Other Nontaxable receipts
3,289.75
584.42
9,121.10
9,288.14
TOTAL ADJUSTMENTS
(3,886.40)
35,109.28
7,378.14
17,839.37
CALCULATED ADJUSTED GROSS
INCOME
100,577.12
73,991.12
92,328.83
60,905.19
REPORTED ADJUSTED GROSS
INCOME
44,868.40
38,604.31
44,799.86
39,997.52
Unreported Income
55,708.72
35,386.81
47,528.97
20,907.67
*116 Included in the net worth computation set forth herein, as an asset belonging to petitioners, is a parcel of real property located at 2184 Fairhill Road (hereinafter referred to as the Fairhill property). This property was acquired in 1960 with Carr's assets, at which time title to the property was recorded in the name of Cathleen, petitioners' daughter. In their tax returns for the years 1960 through 1965, petitioners reported the income from, and claimed depreciation on, this property. For the years 1960 and 1961, petitioners used a cost basis for depreciation of $ 5,166.66. In an audit for these years, it was determined that the Fairhill property had a basis of $ 11,796.13, of which $ 4,000 was allocated to land. Petitioners accepted the results of this audit and used the basis determined therein for purposes of calculating depreciation in subsequent years. On February 21, 1967, an agreement was entered into whereby the Standard Oil Company of Ohio (Ohio) was granted an option to purchase the Fairhill property for $ 50,000. Petitioners' tax return for 1966 did not include income from, and deductions allocable to, this property; such income and deductions were reported *117 in a tax return filed for Cathleen. Ohio exercised its option, and the Fairhill property was sold for $ 50,000 in November 1967. Income and expenses allocable to the property prior to its sale were reported in the 1967 tax return for Cathleen. The depreciation claimed as a deduction in this return was calculated using a basis of $ 17,796.13. Gain from the sale of the property was calculated using an adjusted basis for the property of $ 37,356.73. Washington, who prepared Cathleen's tax returns for 1966 and 1967, decided to treat the Fairhill property as belonging to Cathleen for tax purposes beginning in 1966 because at that time he first learned that the property was titled in her name. He increased the reported basis in the property for 1967 when Carr informed him that a $ 10,000 mortgage had been assumed at the time the property was acquired. At all times, including the taxable years at issue, Carr received the rents from the Fairhill property and used the amounts so received for his own purposes. Carr was the owner of the Fairhill property at all times prior to its sale to Ohio. Properties located at 2345 East 59th Street (the 59th St. property) and at 7608-12 Dix *118 Court (the Dix Court property) are included as assets of the petitioners in the net worth computation set forth herein. These properties were acquired in 1969, with title to the 59th St. property taken in the name of one Larry Smith and title to the Dix Court property taken in the name of one Dan Wheelright. Each of these individuals subsequently transferred title to the property in his name to petitioners' daughters, one to Leah and one to Cathleen. Carr provided the funds used to purchase these properties, and received, and used for his own purposes, the income therefrom at all times, including the pertinent portion of the taxable periods at issue herein. The Dix Court property was purchased from Quincy S&L, and the transaction was structured in the above-stated manner so that it would not appear that Carr had purchased property from the bank. At all pertinent times, Carr owned the 59th Street and Dix Court properties. Carr, in conjunction with other bank officials, sometimes used false names to purchase other property in which Quincy S&L had an interest (and which is not involved in the net worth statement) to avoid the appearance of a conflict of interest. In other instances, *119 Carr arranged for other individuals to purchase properties on his behalf because he believed that a lower purchase price could be so obtained. Certificates of deposit and bank accounts bearing the names of one or more of Carr's children, whether or not such certificates and accounts also bore the names of Carr and/or Mrs. Carr as trustee or otherwise, are included in the net worth computation set forth herein, as follows: Amount Included Year
Certificates of Deposit
Bank Accounts
1966
$ 60,000.00
$ 14,656.18
1967
111,500.00
13,453.34
1968
118,000.00
26,472.70
1969
126,000.00
27,583.57
1970
80,500.00
17,077.75
It is stipulated that, except for three certificates of deposit that were purchased with the proceeds from the sale of the Fairhill property, the source of these assets originated with funds of Carr. At all pertinent times, the above mentioned certificates of deposit and bank accounts were the property of Carr. In 1969, Quincy S&L moved its office from Quincy Avenue to Euclid Avenue in Cleveland. Prior to its move, it rented safe deposit boxes to its customers. Some of the boxes were moved to Euclid Avenue, and, although not *120 rented to customers, a few were used by officers. Carr used one or more safe deposit boxes both before and after the move. On occasion during the taxable years at issue, Quincy S&L ran short of cash. In such instances, one of the bank's officers placed an order for additional cash with another bank and sought cash from Carr to carry the bank through the shortage until the delivery was made. Carr and the officer would go to Carr's safe deposit box and remove the necessary amount. During the taxable years at issue, Carr advanced as much as $ 15,000 to $ 20,000 at any one time. Carr continued assisting the bank in this manner during 1974 and 1975, although the maximum amount advanced at any one time declined to approximately $ 5,000 and the frequency of advances also declined. When Carr advanced cash in this fashion, the bank issued either a receipt or a check in the the amount advanced. If a receipt was issued, Carr would hold it until cash was returned to him, at which time the receipt would be destroyed. Cash reimbursements were made within a few days of an advance. If a bank check was issued, Carr would use it for his own purposes at a later date. Except for copies *121 of the bank checks, no records were kept of these transactions. In addition to advances, Carr used cash from his safe deposit box to purchase bank checks from Quincy S&L. Carr has had a history of recurring chest pains and cardiovascular difficulties. In March 1961, he was admitted to Saint Luke's Hospital for tests and was readmitted in December 1963, after complaining of chest pains. He underwent open heart surgery in February 1970. As a result of concern for his health, Carr reduced the extent of his activities, including his law practice, in the mid-1960s. Henrietta Renwick King and Donald King were clients of Carr. In the early part of 1967, they located a farm at Chub Road in Windsor, Ohio, that they wished to purchase. They wanted title to the farm placed in the name of John Renwick (John), Mrs. King's minor son. Because the seller was unwilling to have title placed in the name of a minor, Carr took title in his own name as an accomodation, and at a later date he transferred title to John. This property was not owned by Carr and is not included in the net worth computation set forth herein as real estate owned by petitioners. On July 15, 1967, Carr advanced *122 $ 10,000 to Virgil and Alyce Ogletree and received a mortgage from them in the amount of $ 12,500. The funds so advanced belonged to Mr. and Mrs. King, or Deborah Renwick, Mrs. King's daughter.Carr structured the transaction in this manner as a favor to Mr. and Mrs. King, who wanted to assist the Ogletrees without their knowledge. The amount owing on this loan was not a debt due Carr and is not included as an asset of the petitioners in the net worth computation. ULTIMATE FINDINGS OF FACT Petitioners had cash on hand in the following amounts, which includes the amount of cash determined by respondent in the notice of deficiency: Year
Cash on Hand
1966
$ 47,510.62
1967
59,241.87
1968
40,191.87
1969
36,316.87
1970
31,374.00
Petitioners had unreported income in the following amounts for the years specified: 1967
$ 55,708.72
1968
35,386.81
1969
47,528.97
1970
20,907.67
No portion of the deficiency for any of these years is due to fraud. OPINION Respondent determined deficiencies in petitioners' income taxes for the year 1967, 1968, 1969, and 1970 using the net worth method of calculation. Petitioners do not protest respondent's *123 right to use this method as evidence of unreported income (see Lipsitz v. Commissioner, 21 T.C. 917, 931 (1954), affd. 220 F.2d 871 (4th Cir. 1955)). They do, however, challenge the accuracy of some of the component parts used therein. See Holland v. United States, 348 U.S. 121 (1954); United States v. Costanzo,     F.2d     (2d Cir.1978). Petitioners have mounted a two-pronged assault on respondent's determination. First, they allege that they were not given credit for cash which Carr claims to have had on hand at the beginning of the period in question and to have expended during the years at issue. Second, they contend that certain assets were improperly included as belonging to them. With regard to the underlying deficiencies, petitioners have the burden of proving error. Rule 142(a), Tax Court Rules of Practice and Procedure.[3]
*124 Petitioners contend that they should be given credit in their opening net woth (as of December 31, 1966) for approximately $ 200,000 in Carr's safe deposit box at Quincy S&L (of which approximately $ 80,000, according to petitioners, belonged to Mrs. King) and that this cash was practically all expended prior to December 31, 1970, thereby accounting for virtually all of the increases in net worth determined by respondent. Carr testified that he handled substantial amounts of cash in his role as a politician, i.e., district leader - a position he held throughout the taxable years in issue. [4] Cf. Stratton v. Commissioner, 54 T.C. 255, 280-281 (1970). He further testified that he kept substantial sums of cash in his safe deposit box and that he frequently made temporary advances of cash to the bank. Two former officers of Quincy S&L corroborated this testimony at least to the extent of Carr's use of cash to make such advances. These advances amounted to $ 15,000 to $ 20,000 at any one time in earlier years and in amounts of approximately $ 50,000 at any one time in later years. The record also indicates that Carr had heart trouble as early as 1961 and that, *125 because of concern for his health, he began converting his cash into stocks, bonds, and other types of assets. We are satisfied that such use of his cash by Carr commenced long prior to the first taxable year in issue. [5] Using our best judgment, we have concluded, although Carr may well have had $ 120,000 of his own cash on hand at one point, that by December 31, 1966, he had a $ 40,000 cash accumulation on hand and that he used such cash to make investments at the rate of $ 5,000 during each of the taxable years at issue, leaving him with $ 20,000 of such cash on hand on December 31, 1970.Such amounts are additions to those amounts which respondent credited to petitioners in the net worth calculations. [6]
*126 Petitioners further assert that respondent erred in including certain other assets in his net worth computation. Our approach to the question thus raised is governed by the classic proposition that "taxation is not so much concerned with the refinements of title as it is with actual command over the property taxed - the actual benefit for which the tax is paid." Corliss v. Bowers,281 U.S. 376, 378 (1930); Helvering v. Clifford, 09 U.S. 331 (1940); Bowlin v. Commissioner,31 T.C. 188, 205-206 (1958), affd. on another issue 273 F.2d 610 (6th Cir. 1960); Lias v. Commissioner,24 T.C. 280, 310-311 (1955), affd. 235 F.2d 879 (4th Cir. 1956); Marx v. Commissioner,13 T.C. 1099, 1106-1107 (1949), affd. on another issue 179 F.2d 938 (1st Cir. 1950). Thus, placing title in the name of another will not shift the incidence of taxation where complete control is retained. The Fairhill, 59th Street, and Dix Cour properties were acquired with funds originating with Carr. He received the income from these properties, and used such for his own purposes. Although title *127 to the properties was placed in the names of petitioners' daughters, these assets were owned by Carr and we have so found. Consequently, they have been included in our net worth computation. Petitioners argue that respondent also erred in determining that their unadjusted basis in the Fairhill Road property was $ 11,796.13, of which all but $ 4,000 was allocated to the depreciable portion of that property. There is no credible evidence indicating that a higher basis is justified, and we sustain respondent on this matter. Rule 142(a), Tax Court Rules of Practice and Procedure.
Respondent also included in his net worth calculations, as assets belonging to petitioners, numerous bank accounts and certificates of deposit which bore the names of one or more of Carr's children, whether or not such certificates also bore the name of Carr and/or his wife. It is stipulated that the source of these assets originated with funds of Carr or with the proceeds from the sale of the Fairhill property. The record also indicates that some of the interest paid from these accounts was deposited by Carr in his commercial account. Here again, based upon the aforementioned classic proposition concerning *128 "refinements of title" and "actual command," we have found that all the certificates of deposit and bank accounts were owned by Carr. Accordingly, they are properly includable in the computation of petitioners' net worth. [7]
The final question concerns the inclusion, as assets in petitioners' net worth, of a farm located at Chubb Road in Windsor, Ohio, and a loan payable by Virgil and Alyce Ogletree. Petitioners claim that title to the farm was recorded in Carr's name and that Carr was listed as the creditor in the loan transaction as accommodations to Mrs. Henrietta Renwick King. We found the testimony relating to these transactions to be credible, and these two items have been excluded from our net worth computation. As to the additions to tax herein, we recognize that respondent has the burden of proving fraud by clear and convincing evidence. Section 7454(a); Rule 142(b), Rules of Practice and Procedure of this Court; Foster v. Commissioner,487 F.2d 902 (6th Cir. 1973), *129 affg.T.C. Memo. 1972-188; Green v. Commissioner,66 T.C. 538, 549 (1976). Fraud will not be imputed or implied and mere suspicion of fraud is insufficient. Estate of Mazzoni v. Commissioner,451 F.2d 197 (3d Cir. 1971), affg.T.C. Memo. 1970-37; Carter v. Campbell,264 F.2d 930, 935 (5th Cir. 1959). And this precludes a finding of fraud based simply on the petitioners' failure to carry their burden of proof that they did not have unreported income as shown in respondent's net worth calculations. Nevertheless, since fraud can seldom be established by direct proof, it may be based upon circumstantial evidence and reasonable inferences drawn from the evidence. See Stone v. Commissioner,56 T.C. 213, 224 (1971); Otsuki v. Commissioner,53 T.C. 96, 106 (1969); Estate of Mazzoni v. Commissioner,supra.[8] We have kept these admonitions in mind and have concluded that respondent has failed to carry his burden. In support of his contention, respondent argues that the substantial understatements of income, Carr's *130 use of nominees to purchase properties, and his placing of substantial sums in the names of the Carr children are sufficient evidence of fraud. While systematic underreporting of income can be persuasive evidence of fraud (see Kramer v. Commissioner,389 F.2d 236 (7th Cir. 1968), affg.T.C. Memo. 1966-234; Schwarzkopf v. Commissioner,246 F.2d 731, 734 (3d Cir. 1957), affg.T.C. Memo. 1956-155; Estate of Hill v. Commissioner,59 T.C. 846, 855-856 (1973); Harper v. Commissioner,54 T.C. 1121, 1139 (1970)), such understatements are also consistent with negligence or even a mistaken view of the law. Use of fictitious names to conceal the identity of the recipient of income may also be indicative of fraud. See Lipsitz v. Commissioner,supra. But the evidence herein indicates that Carr operated in this manner to facilitate purchases of property at a lower price then he could otherwise negotiate or to acquire assets from Quincy S&L. Admittedly, the purchases from Quincy S&L may have been structured so as to conceal Carr's identity from the bank examiners. But we are unwilling to impute tax fraud *131 from any such misrepresentation, at least where it does not appear that Carr acted unfairly vis-a-vis the bank and where he arranged for title to be placed in his own or his children's names shortly after the properties were acquired.
Nor do we view Carr's placing of assets in the names of his children, under the circumstances of this case, as a significant sign of fraud. He recognized that transferring property to his children could result in tax savings, but structuring one's affairs to minimize taxation can hardly be equated with fraud. If he retained such control over the properties so as to remain liable for the tax on the income therefrom, the most that can be said, based on the record in this case, is that he was negligent in not reporting such income as his own. Respondent's reliance on petitioners' treatment of the Fairhill property is also misplaced. The income and expenses from that property were reported on petitioners' tax returns until 1965 and were thereafter included in Cathleen's return. Cathleen's 1966 return was prepared within six weeks of the date that an option on this property was granted to Ohio. Although the changed tax treatment may have been caused *132 by the imminent gain on the sale, we found Washington's testimony to be credible, i.e., that it was he who treated the property differently because at that time he first learned that the property was titled in Cathleen's name. [9] We are unwilling to treat his mistake as evidence of fraud on the part of petitioners. Cf. Marinzulich v. Commissioner,31 T.C. 487 (1958). [10]
Admittedly, we have our suspicions, indeed strong suspicions, that petitioners' action may have been fraudulent, but respondent has not flushed out the necessary evidence to carry his burden of proving fraud clearly and convincingly. Marinzulich v. Commissioner,supra; Switzer v. Commissioner,20 T.C. 759 (1953). Nor is evidence of negligence -- even gross negligence -- which permeates the record herein sufficient to carry the day for respondent. Thurston v. Commissioner,28 T.C. 350 (1957); *133 Iley v. Commissioner,19 T.C. 631 (1952); Ferguson v. Commissioner,14 T.C. 846 (1950).
Petitioners alleged, by amendment to their petition, that the deficiencies involved herein are barred by the statute of limitations. Respondent argues that the statute of limitations does not bar the deficiencies because of the presence of fraud. Section 6501(c)(1). [11] In the alternative, respondent argues that the deficiencies for the years 1968, 1969, and 1970 may be assessed under the provisions of section 6501(e)(1)(A). [12] Because we have concluded that respondent has not proved fraud, we turn to his alternative argument. *134 The notice of deficiency was mailed to petitioners more than three years, but less than six years, subsequent to the filing of their tax returns for 1968, 1969, and 1970. [13] For the six-year statute of limitations to apply, respondent has the burden of proving that petitioners omitted from gross income an amount in excess of 25 percent of the gross income reported in their returns for each year. Stratton v. Commissioner,54 T.C. at 289; Courtney v. Commissioner,28 T.C. 658, 668 (1957); Reis v. Commissioner,1 T.C. 9 (1942). Proof as to such understatements requires only a preponderance of the evidence. Armes v. Commissioner,448 F.2d 972 (5th Cir. 1971), revg. on another issueT.C. Memo. 1969-181.
It is well established that where the deficiencies are determined by use of the net worth method, respondent cannot rely solely on the presumption of correctness which ordinarily attaches to his determination. Rather, he must establish that the amount of unreported income not attributable to deductions from *135 gross income exceeds 25 percent of reported gross income. Courtney v. Commissioner,supra; Hurley v. Commissioner,22 T.C. 1256, 1264-1265 (1954), affd. 233 F.2d 177 (6th Cir. 1956).
We have set forth in our findings of fact the items of gross income reported by petitioners in their tax returns. For urposes of section 6501(e)(1)(A), gross income includes those items listed in section 61(a), except that section 6501(e)(1)(A)(i) provides that gross receipts from a trade or business are to be taken into account in lieu of gross income therefrom. See Green v. Commissioner,7 T.C. 263, 276-277 (1946), affd. per curiam 168 F.2d 994 (6th Cir. 1948). See also Richards, "The Extended Statute of Limitations on Assessment," 12 Tax L. Rev. 297, 303 (1957). Our findings of fact also contain our affirmative determinations of unreported income and these determinations are sufficient to discharge respondent's burden of proof. Some specific comments are in order, however. First, as to the cash hoard, we accepted petitioner's claim of the total amount of cash which he had at one point. However, we affirmatively *136 determined that the cash was spent over a longer period than claimed by petitioner, and this conclusion was based on the record as a whole, including Carr's own testimony and the inferences to be drawn therefrom. Second, with regard to the bank accounts and certificates of deposit, respondent introduced into evidence copies of what appear to be interest checks which were deposited into Carr's commercial account. This is sufficient evidence that petitioner used these assets for his own purposes. See also footnote 7, supra. The remaining items included in the net worth statement were stipulated or involved properties the income from which was clearly used for Carr's own purposes. As to these items, respondent has clearly met his burden. We are constrained, moreover, to note that petitioners do not contend that the income determined by the net worth method had its origin in any nontaxable source other than the cash hoard. Having found that the portionsof the cash hoard allocable to each of the years at issue were not sufficient to account for the unreported income, we conclude that respondent has satisfied his burden in showing that the unreported income was from taxable *137 sources. Even in a criminal prosecution for tax fraud, where the government is subject to a much more stringent standard of proof, all that is required is that the government negative all possible sources of nontaxable income. United States v. Massei,355 U.S. 595 (1958). No more is required of the respondent where he bears a substantially lesser burden. Although there is language in Armes v. Commissioner,supra, indicating that respondent must establish a likely source, the Fifth Circuit recognized that United States v. Massei might be applicable (448 F.2d at 976, n. 3). Indeed, upon remand, this Court found that respondent had carried his burden both as to likely source and as to the lack of nontaxable sources under Massei. See Armes v. Commissioner,T.C. Memo. 1973-88, affd. per curiam in an unpublished order (5th Cir. 1974, 34 AFTR 2d 74-5583, 74-2 USTC par. 9543). Given petitioners' position as to nontaxable sources and the indications of likely sources contained in the record herein, and without indicating our acceptance or rejection of the Court of Appeals mandate in Armes, we think respondent *138 has carried his burden even within that mandate. We are aware of the fact that many of the same elements are involved both in the fraud issue and the six-year statute of limitations issue. The difference in our conclusions on these two issues is simply a reflection of the fact that respondent has a greater burden of proof on the former issue (clear and convincing evidence) than he does on the latter issue (preponderance of the evidence). It should also be recognized that fraud requires evidence of an intent to evade taxes whereas no such intent need be demonstrated to bring the six-year statute of limitations into effect. Except to the extent stipulated, respondent concedes that he has not established that deductions from gross income claimed in petitioners' tax returns were accurate. Therefore, the amounts so deducted must be subtracted from the unreported income in calculating omitted gross income. Hurley v. Commissioner,supra. For the years 1968, 1969, and 1970, the reported gross income, the understatement of income, and the non-stipulated deductions are as follows: Item
1968
1969
1970
Reported Gross
$ 60,918.18
$ 79,343.78
$ 48,807.37
Income
25 Percent of
Reported
Gross Income
15,229.55
19,835.95
12,201.84
Understatement
Per Net Worth
Computation
35,386.81
47,528.97
20,907.67
Unsubstantiated
Deductions: Itemized
Deductions
306.85
1,465.03
(34.57)
Rental
Expenses
5,243.47
7,970.42
1,822.27
Business
Expenses
10,748.90
8,805.51
5,019.04
Proven Under-
statement of
Gross Income
19,087.59
29,288.01
14,100.93
*139 It is apparent that respondent has established a 25-percent understatement of gross income for 1968, 1969, and 1970. Accordingly, assessment for the deficiencies for 1968, 1969, and 1970 is not barred by the statute of limitations but is so barred for 1967 (see footnote 12, supra). Decision will be entered under Rule 155. Footnotes
1. All references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue.↩
2. Respondent determined in the notice of deficiency that no part of the understatement was due to fraud on the part of Hortense Carr and that the additions to tax for fraud are not applicable to her.↩
1. In addition, petitioner owned 2,819 shares of Quincy S&L of undetermined basis. Since no transactions took place with regard to these shares during the years at issue, the net worth computation is not affected by their exclusion from the computation. ↩
2. This amount includes a reserve for property located at 2184 Fairhill Road. Respondent apparently concedes that the size of this reserve determined in the notice of deficiency was excessive.↩
3. Petitioners earlier indicated that they objected to the categorization of certain expenditures made with regard to their real estate as "Improvements," stating that they should be treated as "part of petitioners' expenditures." There is nothing in the record to indicate the nature of the improvements, and petitioners have not discussed this issue on brief. We conclude that it has been abandoned.↩
4. Respondent does not contend, in the instant case, that Carr had taxable income from the utilization of particular amounts of cash so acquired. See O'Dwyer v. Commissioner, 28 T.C. 698 (1957), affd. 266 F.2d 575 (4th Cir. 1959); Rev. Proc. 68-19, 1968-1 C.B. 810↩. 5. The record indicates substantial increases in investments in the early 1960's. ↩
6. Respondent included, as cash on hand as of December 31 for each year, checks bearing dates of that year and not deposited or cashed until the subsequent year, as well as substantial cash expenditures paid during the first half of January of the subsequent year that could not be traced to a withdrawl from a bank account.↩
7. It appears that approximately $ 45,500-worth of these assets were converted into other assets included in the net worth statement. This is further evidence that Carr maintained complete dominion over these assets.↩
8. See also King v. Commissioner,T.C. Memo 1978-351↩.
9. Any question as to the basis used in computing gain on the sale of the property reported on Cathleen's 1967 return is not indicative of fraud as to the deficiencies involved herein. ↩
10. See also Nigra v. Commissioner,T.C. Memo. 1968-273↩.
11. Section 6501 provides in pertinent part: Sec. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION (a) General Rule. - Except as otherwise provided in this section, the amount of any tax imposed by this title shall be assessed within 3 years after the return was filed * * *. * * *
(c) Exceptions. - (1) False return. In the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed, * * * at any time. ↩
12. That section provides in pertinent part: (e) Substantial Omission of Items. - Except as otherwise provided in subsection (c) - (1) Income taxes. - In the case of any tax imposed by subtitle A - (A) General rule. - If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 percent of the amount of gross income stated in the return, the tax may be assessed * * * at any time within 6 years after the return was filed. * * *↩
13. The notice of deficiency was issued after the six-year statute of limitations had expired for 1967.↩